IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 7, 2019

FILED
01/14/2020
Clerk of the
Appellate Courts

## STATE OF TENNESSEE v. G'WAYNE KENNEDY WILLIAMS a/k/a KENNEY WILLIAMS

**Appeal from the Circuit Court for Lauderdale County**
**No. 9984     Joseph H. Walker III, Judge**

### No. W2018-00924-CCA-R3-CD

The Defendant, G'wayne Kennedy Williams, a/k/a Kenney Williams, was convicted by a jury of three counts of rape, eight counts of rape of a child, three counts of aggravated statutory rape,  three counts of statutory rape by an authority figure, three counts of sexual battery by an authority figure, eleven counts of incest, eight counts of aggravated sexual battery, and two counts of violating the sex offender registry.  The trial court imposed an effective sentence of sixty-four years' incarceration.  On appeal, the Defendant argues (1) that the evidence was insufficient to support his convictions for rape and rape of a child; (2) that the trial court erred by admitting evidence of the Defendant's prior bad acts; (3) that admission of the victim's complete hospital record was improper given that the records contained hearsay statements and that the record was prepared for purposes of prosecution; (4) that the trial court erred by qualifying a witness as an expert in sexual assault nurse examination; (5) that the trial court erred by not declaring a mistrial after the State attempted to enter a recording of the victim's forensic interview into evidence without having provided the interview to the defense before trial; (6) that the trial court erred by failing to sever the sex offender registry charges; and (7) that the trial court erred in its application of enhancement and mitigating factors in sentencing.  Following a thorough review of the record, we conclude that the evidence is insufficient to support five counts of rape of a child, five counts of aggravated sexual battery, and five counts of incest.  In addition, some of the convictions for incest, aggravated statutory rape, statutory rape by an authority figure, and sexual battery by an authority figure were improperly merged.  We remand the case for resentencing and the entry of new judgments.  In all other respects, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed in Part; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Timothy J. Gudmundson (on appeal), Fayetteville, Tennessee; and Vickie L. Green (at trial), Millington, Tennessee, for the appellant, G'wayne Kennedy Williams, a/k/a Kenney Williams.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Michael A. Dunavant, District Attorney General; and Julie K. Pillow, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
## FACTUAL BACKGROUND

This case arises out of the Defendant's sexually abusing his minor stepson, J.M.,[1] between 2012 and 2015. J.M.'s date of birth was December 14, 2001. Because this case involves multiple criminal incidents, we will give a brief overview of the locations in which these offenses occurred. In 2012, the Defendant, his wife A.M., J.M., and J.M.'s siblings moved from Wisconsin to Ripley, Tennessee. While in Ripley, the family lived in houses on Main Street, College Street, and Spring Street. In mid-spring 2014, the Defendant, who was still married to A.M., moved out of the Spring Street house into a trailer on Webb Street that he shared with his brother, Carthell Williams.[2] The Defendant was living in the trailer at the time of his January 2015 arrest. The relevant events occurred at the Main Street house; at A.M.'s workplace during the time the family lived on College Street; the Spring Street house; and the Webb Street trailer.

The June 2015 term of the Lauderdale County Grand Jury indicted the Defendant on the following charges: four counts of rape; four counts of aggravated statutory rape; four counts of statutory rape by an authority figure; four counts of sexual battery by an authority figure; forty-five counts of incest; forty-one counts of rape of a child; forty-one counts of aggravated sexual battery; and two counts of violating the requirements of the sex offender registry. See Tenn. Code Ann. §§ 39-13-305; -13-403; -14-303; -17-1307; -17-1324.

A. Pretrial Motions. Prior to trial, the Defendant, represented by the Public Defender's Office,[3] filed a motion pursuant to Tennessee Rule of Evidence 404(b). He requested that the State be prohibited at trial from discussing any prior bad acts by the Defendant until a hearing could be conducted pursuant to State v. Morgan, 541 S.W.2d 385 (Tenn. 1976), assessing whether the evidence was otherwise admissible. The record

---

[1] It is the policy of this court to refer to minors and victims of sexual offenses by their initials. To protect J.M.'s privacy, we will also refer to his mother, A.M., by her initials.

[2] For clarity, we will refer to Carthell Williams by his first name in this opinion. We intend no disrespect.

[3] Defense counsel was later retained and filed a notice of appearance on March 1, 2017.

is silent as to whether a pretrial hearing was held or an order issued relevant to the motion.[4]

On September 5, 2017, the State filed a motion pursuant to Tennessee Rules of Evidence 902 and 803(6), respectively governing self-authenticating documents and the hearsay exception for documents kept in the regular course of business, requesting that J.M.'s full medical record be admitted into evidence. On September 11, 2017, the Defendant filed a response objecting to admission of portions of the medical record containing "hearsay statements" by J.M. and A.M. and arguing that "[u]nless these persons are present to testify before the [c]ourt, then the introduction of these statements violate the Defendant's right to confront the witnesses[.]" No order from the trial court is present in the record.

B. Trial. At trial, Brian Hickman testified that in 2015, he was an investigator with the Lauderdale County Juvenile Court and that he responded to a call at Lauderdale Middle School on January 16, 2015. When he arrived, the principal, J.M., and J.M.'s mother A.M. were present. J.M. began to speak "about an experience" at a "trailer," and A.M. stated that she believed J.M. had been molested. Investigator Hickman spoke to A.M. and J.M. separately, and J.M. wrote a statement, which was marked for identification only.

J.M. told Investigator Hickman that the most recent "sexual occurrence" happened within seventy-two hours, and Investigator Hickman arranged for J.M. to undergo an examination by a sexual assault nurse examiner (SANE). Investigator Hickman obtained A.M.'s permission to search her house for items of clothing J.M. discussed in his statement. Investigator Hickman, another investigator, J.M., and A.M. went to Jackson for the sexual assault examination.

After the examination, Investigator Hickman reported the Defendant to the Department of Children's Services (DCS), which removed J.M. from the home and arranged a forensic interview. Investigator Hickman obtained an arrest warrant for the Defendant on January 17, 2015, and attempted to contact the Defendant on January 19, 2015, in conjunction with sex offender registry case officer Amy Northcott. Ms. Northcott told Investigator Hickman that she "had some problems with [the Defendant] in the past[.]" Ms. Northcott called the Defendant, and Investigator Hickman offered to drive to the Defendant's location to speak to him. The call was terminated for an unknown reason, and Investigator Hickman was concerned because of "what [he] learned" about the Defendant's past.

---

[4] The only pretrial hearing transcript included in the appellate record is the May 8, 2015 preliminary hearing.

-3-

Ms. Northcott tried to call the Defendant's cell phone repeatedly; eventually, a person who identified himself as Carthell Williams answered. Ms. Northcott conveyed to Carthell that the Defendant needed to come to the police department, but the Defendant did not do so. Investigator Hickman obtained the Defendant's location through his cell phone provider and drove by the location, but he did not see the Defendant. The Defendant left a message for Investigator Hickman the following Monday, stating that he would meet with Investigator Hickman at his attorney's office.

On January 20, 2015, Investigator Hickman went to an attorney's office. The attorney informed Investigator Hickman that she had been retained only in regard to a driving under the influence charge and that she did not represent the Defendant outside this limited scope. When the Defendant arrived, he told Investigator Hickman that he did not want to speak to him. Investigator Hickman arrested the Defendant for "violation of [the] sex offender registry." After the Defendant was in jail, Investigator Hickman obtained arrest warrants based upon the information he received from J.M., A.M., and the SANE nurse. Investigator Hickman, another investigator, and Ms. Northcott also drafted a search warrant for the Defendant's trailer and executed the search.

Investigator Hickman identified photographs of letters and packages seized in the Defendant's trailer on Webb Street. The items were dated October and December 2014, and two letters were sent to an address on Spring Street and reflected a sticker indicating the change of address to Webb Street. A water utility bill was addressed to the Defendant "or Carthell Williams." A Tennessee Department of Human Services letter was addressed to "Kennedy D. Williams."[5]

Investigator Hickman also identified photographs of a Game Boy Advance; an Xbox video game console; a box containing Xbox games; bicycle pegs for a child's bicycle and a suitcase with child-size clothing; a "Star Wars lego box" that J.M. said he "transported and hauled his Xbox around in," which was found in the master bedroom; and a Playstation 3 video game console. Investigator Hickman noted that the trailer contained a "child's room" with a bunk bed, a drawer of children's clothing, hair extension, Halloween masks, and children's size nine and ten shoes. Investigator Hickman noted that no children were supposed to be living with the Defendant.

Investigator Hickman identified photographs of a hallway closet inside the bathroom, which was "stipulated as an area of interest"; a balloon kit with a helium tank; the children's clothing they found, including "school clothes" and undergarments that J.M. identified as his; "toddler size" clothing; and "a Softee brand Light and Natural Hair and Scalp Treatment" that matched J.M.'s description of a lubricant or "grease" used by

---

[5] It was apparent from the trial testimony that the Defendant was also known as Kennedy D. Williams and Kenney D. Williams.

the Defendant during the most recent incident. The hair treatment was found in the bathroom closet, consistent with J.M.'s statement. Investigator Hickman seized the sheets and blankets found in the bedrooms as well as the hair treatment.

Samples of DNA were taken from the Defendant and J.M. and analyzed by the TBI laboratory. The TBI did not find a combination of J.M.'s and the Defendant's DNA on any item. Investigator Hickman noted, though, that "it was just the two sheets that were . . . left in the house."

Investigator Hickman stated that he was given the names of "five or six . . . additional juveniles that were possible victims or possible witnesses of . . . sexual acts, on [J.M.] or themselves." Investigator Hickman agreed that J.M. indicated other children had been coming to the Defendant's house to play video games. Investigator Hickman and DCS conducted interviews of the other children and their parents, "none of which had any statements to make or any concerns." He verified, however, that the children had been inside the Defendant's trailer.

Investigator Hickman identified a transcript of J.M.'s January 22, 2015 forensic interview, which he stated had also been video recorded. Defense counsel objected, stating, "The taped interview has not been provided to defense counsel, and I'm unfairly surprised by learning that a tape still exists, and I would like an opportunity to review that tape." The trial court ordered that the transcript be marked for identification purposes only.

Investigator Hickman identified records from the electric company showing that on August 21, 2012, A.M. moved into an apartment on Main Street. She moved out on August 2, 2013, and relocated to a duplex on College Street. She moved from that address on January 21, 2014, and into the house on Spring Street. Investigator Hickman noted that the moves were consistent with J.M.'s recollection of the order of sexual assaults.

Investigator Hickman noted that at the Spring Street house, J.M. slept in a room containing a loveseat and armchair and that stairs to the basement connected to J.M.'s room. The basement was divided into a "wash room" and a space for the family dog.

On cross-examination, Investigator Hickman testified that A.M. was the first person to mention molestation to him. He stated that he spoke to J.M. with the principal and school resource officer present and that J.M. disclosed "the events that happened on the 14th." Investigator Hickman noted that J.M. was "a little bit bashful" when discussing male genitalia and that "[w]e let him think about it before he spoke and said anything." DCS placed J.M. in his biological father's custody in Chicago.

The search of the Defendant's trailer did not occur until after he had been arrested. When Investigator Hickman arrived at the Defendant's trailer, Carthell "showed up as [the officers] were there[,]" and they learned that Carthell was also named on the lease. Investigator Hickman showed Carthell the search warrant. Carthell indicated that the master bedroom of the trailer was his, but he did not tell Investigator Hickman to whom the children's bedroom belonged or where the Defendant slept. Investigator Hickman was aware that Carthell was also charged by Ms. Northcott for a violation of the sex offender registry, but Investigator Hickman did not know if Carthell's prior conviction involved children. Investigator Hickman did not ask Carthell if he had grandchildren, and Carthell did not volunteer that information. A.M. told Investigator Hickman that she had taken several of J.M.'s belongings, which were boxed up, to the Defendant's trailer. Investigator Hickman noted that the items were not "completely packaged" and that tied-up bags were torn open.

Investigator Hickman opined that children's belongings were present in the trailer that "seemed to belong to the children [who] were not [the Defendant's] biological children[.]" Investigator Hickman acknowledged that there was "no indication that [Carthell's] grandchildren were actually there" at the same time as the Defendant. He stated, though, that children's clothing was stored at the trailer.

Investigator Hickman testified that two other children "verbally . . . stated that they were at [the trailer]. They couldn't give [him] a time frame, so they didn't give any statements because they didn't want to." When Investigator Hickman presented the Defendant with the search warrant for his DNA sample, the Defendant "had some words to say, but typically . . . everybody would be distraught" to give a DNA sample by court order. Once the Defendant read the search warrant, "he was one hundred percent willing" to comply. Investigator Hickman's understanding of the sex offender registry rules indicated that a person on the registry could not stay overnight with the person's biological grandchildren; Investigator Hickman did not see why Carthell would have clothing for young children stored at the trailer.

Traci Walker testified that she had worked for Jackson Madison County General Hospital in the emergency department since 2003 and that she had been a SANE nurse for eleven years. She had a master's degree in nursing and was a state licensed nurse practitioner, registered nurse, and emergency medical technician. She underwent forty hours of education to be certified as a SANE "in order to have a more advanced knowledge of . . . exams for victims of sexual assault and rape." Ms. Walker also "attended numerous conferences which . . . allowed [her] to further that knowledge in countless areas." She had examined all ages of patients in "medical forensic exams," which entailed medical treatment, reviewing the patient's medical background, and an examination to collect possible evidence of sexual assault or rape if the patient was

examined within ninety-six hours of the event. Ms. Walker had performed over one hundred examinations and had testified in three trials.

Defense counsel stated that if Ms. Walker's expert testimony was "limited to what is done for the purpose of collecting evidence of sexual assault, [counsel would] accept her as [an] expert because [counsel believed] she's been so trained. [Counsel did] not believe she ha[d] been trained to give a diagnosis[.]" Upon questioning by counsel, Ms. Walker testified that her undergraduate and graduate nursing coursework did not cover "treating sexual assault" and that forensic examination was a specialized course. Ms. Walker became a SANE in 2006. Ms. Walker did not opine as to whether someone was raped or sexually assaulted as part of her examination. The trial court qualified Ms. Walker as an expert, although it did not specify her area of expertise.

On direct examination, Ms. Walker identified J.M.'s medical record, which contained Ms. Walker's report. The medical record indicated that J.M. was age thirteen. Ms. Walker was alone with J.M. during his examination; J.M. was "very cooperative" and looked at Ms. Walker when she spoke to him and when he answered questions; and J.M. was calm and willing to answer her questions.

When Ms. Walker was asked by the prosecutor to read an excerpt from the medical records, defense counsel objected on the basis of hearsay, arguing that J.M. would testify as to the contents of the record. The trial court overruled the objection and stated that it would "allow the history in as a hearsay exception."

Ms. Walker read the following into the record:

[J.M.] was brought to the ER tonight by Lauderdale Sheriff's Department for a SANE exam after telling the principal that his [stepfather, the Defendant], has been sexually assaulting him. [J.M.] states that [the Defendant] started, quote, messing with him since the summer before . . . he went into the fifth grade. [J.M.] also stated that he began telling his mother about what [the Defendant] was doing to him after her and [the Defendant] were married. [J.M.] said that [he] and [the Defendant] used to do a lot of things together and then, quote, when he got that bracelet off his ankle he was a different person, end quote.

[J.M.] says Wednesday night his mom took him to McDonald's and then to [the Defendant's house] because [the Defendant] was supposed to talk to [J.M.] about his behavior at school. [J.M.] says his mom left, and it was him, his two friends, [the Defendant], and [the Defendant]'s brother [Carthell]. [J.M.] said his two friends left with their mom. Then [Carthell] left to go to his girlfriend's.

[J.M.] says [the Defendant] watched until [Carthell] left the driveway, then immediately told him to go to the bedroom. [J.M.] says [the Defendant] told him to take off his clothes and [the Defendant] took off his clothes too. [The Defendant] then touched [J.M.]'s penis with his hands and then said, quote, he put his mouth on it, end quote, and he says, quote, until I was finished, end quote.

I asked [J.M.] if . . . that was when [the Defendant] made him ejaculate or come, and he said yes. He says he understood what that meant. [J.M.] says after that, quote, he made me stick mine in his bottom until I was finished again, end quote. Then [J.M.] says, quote, he stuck his in my bottom until he was finished, end quote. [J.M.] said after that [the Defendant]'s brother came back and was knocking on the door and everything stopped. Upon examination a small tear at the top of the buttocks at the beginning of the, quote, crack consistent with forcible separation of the buttocks, as well as large folds of skin around the anus not consistent with normal anatomy of a 13-year-old child. There were no other findings, no bleeding. [J.M.] reports pain during defecation and urination.

And an addendum later after the exam was added that [J.M.] disclosed two other names of adolescents that have been possibly assaulted by [the Defendant]. Names and ages were given to investigators.

Ms. Walker stated that a victim's version of events was important to her examination because she needed to know which areas of the body needed to be examined, as well as informing the forensic laboratory how to rank the evidence in importance.

Ms. Walker testified that J.M. had a "very large tear, approximately three to three-and-a-half inches" at the top of his buttocks consistent with them being "separated very forcefully, the skin from the top, down into in between the buttocks[] was torn open." Ms. Walker noted that the wound was "somewhat dried because it had been about a day or two after the event was reported, but it was still red." Ms. Walker further testified,

[W]hen you have continuous and numerous events of traumatic injury [to the anus] that causes tears to the anal skin, the skin that the anus is made of . . . has a certain amount of stretch to it[,] . . . so after prolonged periods of traumatic injury causing fissures . . . that skin heals and causes scar tissue, and that scar tissue produces what some people would call like a skin tag which will protrude from the anus.

She stated that in her experience, anal skin tags were not part of the "normal anatomy of a young child" and that J.M.'s skin tags were "very significant to corroborate the story that he gave [Ms. Walker] about what happened."

Ms. Walker testified that she found evidence of injury, whether new or old, in an "extremely low" percentage of sexual assault examinations because of the elastic nature of the tissue in the areas involved. Ms. Walker stated that in J.M.'s case, his anatomy "was more consistent with the scar tissue that had formed from the fissures or the tears of the skin around the anus and the anal skin that cause the protrusions to come from the anal opening." J.M. reported that his pain "immediately post assault" was a seven or eight out of ten and that he experienced pain during bowel movements of a seven out of ten. Ms. Walker stated that the fissures and scar tissue "in the degree" J.M. had would not have been caused by constipation.

J.M. also reported during his medical examination that he was intimidated by the mere presence of the Defendant. J.M. reported that the Defendant did the following: touched or fondled J.M., including his genitalia; kissed J.M.'s neck and face; touched J.M.'s genitals with his mouth; had J.M. touch the Defendant's genitals with his mouth; had J.M. touch or fondle the Defendant's genitals; anally penetrated J.M. with his penis; touched J.M.'s anus; had J.M. anally penetrate the Defendant with J.M.'s penis; and had J.M. touch the Defendant's anus. J.M. identified the Defendant as his assailant. J.M. denied that the Defendant used condoms and stated that the Defendant used hair grease as a lubricant. J.M. reported that the Defendant ejaculated into a towel. J.M. also reported a "[p]rior history of threat or violence" with the Defendant and that the Defendant had been sexually assaulting J.M. since "the summer before [J.M.] went into fifth grade."

Ms. Walker documented that J.M. was "very cooperative, answers questions age appropriately, may pause to find words and describe what he is saying." Ms. Walker compared J.M.'s anal anatomy with "women who have had vaginal births, possibly . . . hemorrhoids at some point. 40s, 50s." In Ms. Walker's opinion, the large folds of skin around J.M.'s anus were caused by "repeated trauma over . . . a long period of time[.]" She stated that no medical procedures or history were documented that indicated a problem with J.M.'s anal anatomy.

On cross-examination, Ms. Walker testified that due to J.M.'s age, even if he had chronic constipation from infancy, it would not have caused enough "traumatic injury" to cause the anal skin folds to form. Ms. Walker stated that J.M. would have had to be anally penetrated "[m]ultiple" times and that it "would be a chronic situation," although she did not know an exact number. She noted that the length of time during which the penetrations occurred was not as relevant as the number of penetrations. Ms. Walker estimated that fifty or more penetrations would be required to create the skin folds. Ms.

Walker stated that she would not reconsider her opinion if J.M. failed to identify fifty such "attacks."

Ms. Walker testified that she had examined "several younger male children" between ages five and seven, "two or three" adolescent males, including J.M., and "several adult male[s,]" and that in her experience, there was no other explanation for the tear above J.M.'s buttocks than the buttocks being jerked apart. She acknowledged that J.M. did not report such an event during his examination. Ms. Walker was aware that J.M. had undergone a previous hernia operation. When asked whether there could have been other medical reasons for J.M.'s anal anatomy, Ms. Walker stated, "There were no other medical reasons disclosed to me." Ms. Walker acknowledged that J.M.'s story informed her examination, although she stated that she "documented what [she] saw." Ms. Walker described J.M.'s tone as that of a normal thirteen-year-old boy, and she denied that his affect was "wooden." To Ms. Walker's knowledge, J.M. did not claim the Defendant used violence against him. Ms. Walker stated that she had never examined a homosexual man and that what she knew about anal skin folds was "more of a medically known thing than . . . a forensic thing." She acknowledged that "[e]xtremely hard bowel movements can occasionally cause anal fissures." Ms. Walker stated that due to J.M.'s age, as well as "the fact that [neither] chronic constipation nor medications taken for chronic constipation were disclosed to [her]," the possibility that his injuries were caused by constipation was not taken into consideration. Ms. Walker further stated that her observations were based upon the information J.M. gave at the time of the examination. Ms. Walker noted, though, that she did not agree with the statement that no differences existed between fifty instances of anal penetration and fifty "very tough bowel movements."

Ms. Walker testified that bowel movements large enough to cause the type of injury she observed in J.M. would be too large to be passed "naturally . . . . Normally when you have stool that is that large it causes bowel obstruction[.]" In contrast, she stated that "[f]orceful" anal penetration, "whether it [was] ever so slight, attempted, or successful, [could] cause a large amount of trauma, especially if the person . . . is resisting[.]" Ms. Walker noted that whereas the brain and body worked together to evacuate a bowel movement, she did not know of "many [thirteen]-year-old boys who sit and willfully allow someone to forcefully [anally] penetrate" them in such a way that J.M.'s injuries would be produced. Ms. Walker stated that the other two previous examinations she had performed on adolescent boys did not involve anal penetration. Ms. Walker further stated that although one instance of anal penetration could cause tearing, five such instances would not cause scar tissue or skin tags to form. The tissue would generally heal such that no evidence of penetration in the form of scar tissue would be present.

When asked to describe "the difference in the skin tags that might form" in individuals who experienced chronic constipation and a person who was anally penetrated, Ms. Walker responded that each individual was different. Ms. Walker reiterated that a "bowel movement large enough to chronically cause that many skin tears in the anal opening . . . you would not have the ability to naturally eliminate that from your body. A bowel movement that large would cause a bowel obstruction." She noted that, comparing the anus to a clock, "you may have skin tags [caused by frequent anal tearing due to bowel movements] at the [twelve] and the [six] o'clock position. Other positions of those skin tags usually are caused by something else other than . . . chronic constipation." Ms. Walker stated that large bowel movements might cause "small skin tags" depending on how the person healed.

After Ms. Walker's testimony and outside the presence of the jury, defense counsel objected to Ms. Walker's qualification as an expert witness, arguing that "it seems to indicate that she did not have the background she indicated in her voir dire[.]" The court overruled the objection.

J.M. testified that his date of birth was December 14, 2001, and that at the time of trial he was age fifteen. His mother, A.M., married the Defendant in Wisconsin when J.M. was in third or fourth grade. J.M. stated that the Defendant wore a black ankle bracelet in Wisconsin, that the family moved to Tennessee before J.M. started fifth grade, and that the Defendant did not wear the ankle bracelet in Tennessee. J.M. said that the Defendant's behavior changed once he stopped wearing the ankle bracelet. Specifically, in Wisconsin, the Defendant was "nice, kind, he was nice to [A.M., and they] used to go fishing[.]" Once the Defendant got the ankle bracelet off, it "was like [he] just changed bodies." The Defendant told J.M. that he wore the ankle bracelet for "[h]is heart[,]" although J.M. "[knew] different[ly] now[.]"

The family initially lived in a house on Main Street in Ripley, Tennessee, for about one year, then on College Street for one year, and finally on Spring Street for one or two years before J.M. moved to Chicago with his biological father. A.M., J.M.'s three sisters, and the Defendant lived with J.M. at those locations in Tennessee. At some point when the family lived on Spring Street, the Defendant and A.M. argued, and the Defendant moved into a trailer with Carthell.

J.M. went to the Defendant's trailer "[a] lot" to play video games, sometimes accompanied by three of his friends. J.M. spent the night at the trailer and had clothes there. J.M. stated that on January 16, 2015, he had a meeting at school with the principal, A.M., and some teachers regarding whether he would be sent to an alternative school for "acting out." J.M. acknowledged that he had been acting out, and he stated that he was angry due to "[t]hings that [were] going on at home. Don't know really why I was . . . taking my anger out on everybody else." J.M. clarified that he referred to "[t]he things

-11-

with [the Defendant]." J.M. stated that at the meeting, he said that the Defendant "was touching" him. After he made this statement, A.M. stayed in the room; the teachers left; and a police officer came into the room. J.M. did not remember where A.M. went while the police officer spoke to him.

J.M. testified that he did not tell A.M. about the abuse because he was "afraid." He said, though, that he told A.M. about an instance in which he and the Defendant watched pornography together when J.M. was in fourth grade.

J.M. testified that on January 15, 2015, he was at the Defendant's trailer with his friends and Carthell. Carthell left to visit his girlfriend. J.M. and his friends played video games on an Xbox. J.M.'s friends were picked up by their mother. J.M. went to the "back bedroom" to retrieve "the game box" and the Defendant followed him. The Defendant told J.M. to pull down his pants; the Defendant pulled down his own pants; the Defendant applied a lubricant to his penis and sat on the bed; and the Defendant told J.M. to "sit on" his penis. J.M. faced away from the Defendant and did as he was told; the Defendant ejaculated. The Defendant told J.M. to put his mouth on the Defendant's penis, and J.M. complied. The Defendant told J.M. "to get in a dog position" on the bed; J.M. complied; and the Defendant anally penetrated J.M. with his penis before ejaculating into a towel. When asked "how long this had been going on," J.M. estimated five years. J.M. stated that "things" also happened at the Spring Street, College Street, and Main Street houses.

J.M. testified that on one occasion in the Spring Street house, the Defendant went to an upstairs closet, applied petroleum jelly to his penis, came into J.M.'s bedroom, and anally penetrated J.M. J.M. was positioned with his back on the floor with his legs over his head. On another occasion at the Spring Street house, the Defendant told J.M. to put his mouth on the Defendant's penis while they were in J.M.'s bedroom. On yet another occasion at the Spring Street house in the basement, the Defendant took "two covers down [and] put them on the floor" and applied "another grease to his penis"; the Defendant anally penetrated J.M; the Defendant put his mouth on J.M's penis and told J.M. to put his mouth on the Defendant's penis; and J.M. put his mouth on the Defendant's penis.

J.M. testified that when the family lived on College Street, the house was small and they shared bedrooms. A.M. worked delivering food to elderly people, and the Defendant had a key to A.M.'s workplace. When no one else was in the building, the Defendant took J.M. to A.M.'s workplace's reception area, applied cocoa butter to his penis, and told J.M. to "sit on it."

J.M. testified that when the family lived on Main Street, on one occasion, A.M. was doing J.M.'s sister's hair in a front room when the Defendant took J.M. into A.M.'s

bedroom. The door was closed; the Defendant did not apply lubricant to his penis and told J.M. to sit on it; and the Defendant anally penetrated J.M. as the Defendant sat on the bed. The Defendant did not undress, and J.M. had his pants pulled down in the back. On another occasion, A.M. and J.M.'s sisters went to church, but the Defendant told A.M. falsely that J.M. had thrown up so that the Defendant and J.M. would stay home. In the front room of the house, the Defendant anally penetrated J.M. without using lubricant. J.M. was in "a dog position" with "one leg . . . off the couch[.]" J.M. stated that generally, "either . . . somebody [was] home and [the Defendant] would tell me to come into the room and lock – I mean, not lock the door – close the door, or they would be gone to church." One time, the Defendant told A.M. that they needed milk to get her to leave the house, but J.M.'s sister remained in the house.

J.M. testified that it "d[id]n't feel right" when the Defendant anally penetrated him and that it sometimes hurt. J.M. stated that after the meeting at his school, he told his teachers, family members, a friend, a doctor, a foster parent, a person at the "Carl Perkins Center," a police officer, and a social worker what the Defendant had done to him. J.M. also testified in a preliminary hearing. J.M. affirmed that he was telling the truth and stated that when he was living with his father in Chicago, Carthell called him and said, "Why did you tell, and couldn't [you have] told any other of our family members." J.M. said that the Defendant sent letters to A.M. and that Carthell signed them and claimed to have authored them.

On cross-examination, J.M. testified that he told people at his school about certain details of his memories of the abuse, like having been in a dog position. J.M. stated that he learned the term "dog position" from the Defendant. J.M. said that he had reviewed his previous statements with the prosecutor and Investigator Hickman for two days prior to the trial. He acknowledged that they had to remind him of some of the details of his previous statements. J.M. denied having been shown his previous written statement or discussing "what's happening down here" with anyone in Chicago. J.M. stated that when he testified, he tried to remember what happened, not the contents of his previous statements.

J.M. testified that when he was in fourth grade, he told A.M. that he and the Defendant watched pornography together and that A.M. "put a stop to that." J.M. agreed that he learned "all this sexual stuff" while watching pornography with the Defendant. J.M. stated that he watched pornography by himself while living in each of the three houses in Ripley. He said, though, that the pornography did not depict homosexual men. J.M. noted that relative to the Defendant's living with the family, while they lived in Ripley, the Defendant "was with [the family], but he wasn't with [the family]." J.M. did not remember testifying at the preliminary hearing that nothing ever happened with the Defendant when A.M. or J.M.'s sisters were home. When asked whether he had testified

-13-

during direct examination that he anally penetrated the Defendant, J.M. stated that he had testified to this fact at the trial and had also reported it to a counselor. When asked whether he had a "real difficult time remembering things," J.M. responded, "Somewhat."

J.M. testified that he had been to an alternative school once before the January 16 meeting. He agreed that after reporting the abuse, he did not have to return to the alternative school and instead went to foster care for one or two months. J.M. stated that foster care was "okay," that he went to another school, and that he did not have any problems at the new school. J.M. did not have any problems in the school he attended in Chicago once he lived with his father, although he said that he was a "[l]ittle bit" angry with A.M. for failing "to watch out for" him. J.M. acknowledged that he made a recent post on Facebook in which he expressed anger at A.M. and his sisters.

J.M. testified that on January 14, 2015, his friends, who were at the Defendant's trailer, asked J.M. to come there. He acknowledged, though, that A.M. also took him there so the Defendant "could talk to [J.M.] about the coming disciplinary action[.]" J.M. said that his school called the Defendant about J.M.'s having received a "pink slip." While J.M. was at school, the Defendant boxed up all of J.M.'s toys and took them to the Defendant's trailer. J.M. stated, though, that his games were kept at the Defendant's trailer from "way back" as a punishment. J.M. stated that at the trailer and before his friends left, he and the Defendant spoke about the pink slip. The Defendant took J.M. into the back room and "whipped" him with a belt; J.M. had red marks that faded after about ten minutes. Afterward, J.M. played games at the trailer for about two hours; Carthell left to see his girlfriend; J.M.'s friends left; and then the Defendant took J.M. into the back room for sex. Carthell did not return before A.M. picked up J.M. J.M. stated that he knew the difference between telling the truth and a lie.

On redirect examination, J.M. testified that the Defendant had J.M.'s Xbox since the time he moved into the white trailer and that the Defendant took J.M.'s PlayStation 3 to the trailer one week after J.M. received it as a Christmas gift. Any time J.M. or his friends wanted to play J.M.'s video games, they either had to bring a game console to the Spring Street house or go to the Defendant's trailer. J.M. noted that his friends did not have many games, so they went to the trailer "a lot."

A.M. testified that she met the Defendant in Wisconsin in October 2010, and they were married in 2012. A.M. heard in the community that the Defendant was a sex offender; she brought it up with him; and he told her that "he had been incarcerated several years for rape." The Defendant wore an ankle monitor, which was removed before they moved to Tennessee. The Defendant did not tell A.M. "what his rules were" in regard to being a registered sex offender. In March 2012, the Defendant moved to Tennessee, and A.M. followed later with J.M. and J.M.'s sisters. They first lived on Main Street for one year, College Street for about six months, and then Spring Street.

-14-

The Defendant lived with them until early spring 2014, when he moved to the trailer after a disagreement regarding the children. A.M. stated, though, that the Defendant was "bouncing between" the trailer and the Spring Street house and that the Defendant spent the night and kept belongings in both places. Most of the Defendant's mail went to the trailer's address.

On September 23, 2014, the police came to the Spring Street house looking for the Defendant; A.M. told them the Defendant was at work and had moved out. For the first time, A.M. was told that the Defendant was not supposed to be living there. A.M. noted that at the Main Street house, officers "would come to the house to check up on" the Defendant when the children were outside waiting for the school bus and that the officers never said anything to her. The Defendant did not tell A.M. that he was not supposed to live with children other than his own biological children.

When the family moved to Tennessee and the Defendant had his ankle tracker removed, at first "[t]hings were pretty good[.]" Six or seven months after the Defendant and A.M. married, things went "downhill," and they argued about the Defendant's spending "a lot of time outside in the streets" and spending time with Carthell. Carthell lived with them for a time at the Main Street house. After the Defendant moved to the trailer, J.M. and his friends went to the trailer to play video games and "hang out with" the Defendant and Carthell. A.M. knew that this was not permissible, but she allowed it because the Defendant stated that he "didn't do anything that they said [he] did to those children" and that he pled no contest on the advice of his attorney. The Defendant told A.M. that he would never hurt her children and that she had given him a family. A.M. believed and trusted the Defendant and thought that the Defendant deserved a second chance.

When J.M. was age ten, he told A.M. that he and the Defendant watched pornography. A.M. and the Defendant argued about it; the Defendant apologized and claimed it was a lapse in judgment; the Defendant stated that A.M.'s children were the most important thing in his life; and the Defendant said it would never happen again. A.M. had been molested as a child and regularly asked the children if the Defendant "ma[d]e [them] feel uncomfortable." J.M. responded, "I got this. No, mom, I'm fine. I'm fine." A.M. stated that J.M. referred to the Defendant as "dad" and had a better relationship with the Defendant than his biological father. The Defendant and J.M. went fishing together. A.M. opined that J.M. kept the abuse from A.M. because he loved the Defendant.

A.M. began working for Meals on Wheels in 2014, which was based in a building that was connected to a day care building. A.M. noted that the day care building was white. The Defendant sometimes helped A.M. deliver meals, including making deliveries alone.

On January 15, 2015, A.M. attended the disciplinary meeting at J.M.'s school. J.M. had been "taunting children, being mean to other kids . . . all out of his character, stuff that [J.M.] would never do." A.M. came to the school under the impression that J.M. had gotten into a fight with another boy. A.M. denied knowing that J.M. had been in trouble for choking a girl. A.M. noted that the aggressive behavior was new and that the principal stated, "[J.M.] is such a sweet young man. I don't understand what's going on." J.M. "looked at [A.M.] . . . with a look that [A.M.] hadn't seen before." A.M. asked J.M. if there was something he wanted to tell her, and J.M. said that something happened at the trailer. A.M. knew J.M. was referring to the Defendant's trailer and said that she thought J.M. had been molested. The meeting stopped and two police officers were called into the meeting. Investigator Hickman eventually also arrived. J.M. told the officers that he was more comfortable speaking to them privately. DCS came in and took A.M. and J.M. back to the Spring Street house. J.M. and A.M.'s two minor daughters were taken to foster care; A.M.'s oldest daughter, who had special needs, was permitted to stay in the home. J.M. and A.M. went to Jackson for J.M.'s sexual assault examination.

A.M. testified that the Defendant encouraged A.M. to leave the house with her daughters and leave J.M. alone with him. Relative to the defense's claim that J.M.'s anatomical irregularity was caused by chronic constipation, A.M. stated that in Wisconsin, J.M. had been prescribed a medication for constipation. After moving to Tennessee, A.M. recalled J.M.'s being treated for heartburn, but not constipation. J.M., who was born with a hernia, had surgery to repair the hernia when he was ten months old. The hernia had not caused issues since. He also had an appendectomy in 2012 while the family was in the process of moving to Tennessee.

A.M. testified that before trial, the Defendant's sister called her and said, "[H]e'll give you $5,000 if [J.M.] change[s] his testimony." Carthell called A.M. on September 11, 2015, and told her, "If you come down here they [are] going to put you in a hotel and they [are] going to lock you in there until trial and then they [are] going to arrest you." Carthell claimed that "they" had been trying to subpoena A.M. and that there was a warrant for A.M.'s arrest. Carthell had called A.M. "a few times" since, but she did not answer. The Defendant wrote A.M. letters before she moved back to Illinois after these events, saying that she "shouldn't testify, they [are] going to lock you up, they [are] going to lock up [J.M.] because he's turning [fifteen] and he can be prosecuted for perjury[.]" A.M. destroyed the letters and spoke to J.M. about them. A.M. felt guilty about the abuse and apologized to J.M. "all the time[.]"

On cross-examination, A.M. testified that she did not search for the Defendant on the sex offender registry website and that she and the Defendant only searched the website "to see where he could live without his brace[.]" A.M. knew the Defendant had

been charged with sexual assault on a minor and that the Defendant had never admitted he harmed anyone. A.M. agreed that her marital problems began after Carthell moved in with the family. Carthell lived with the family for six months before moving in with his girlfriend.

A.M. agreed that the Defendant was "the disciplinarian in the house" and that the Defendant tried to "keep [J.M.] in line." She took J.M. to the trailer on January 14, 2015, because J.M. received a pink slip at school and generally, if the Defendant spoke to J.M. he would "do better." The Defendant and Carthell were present at the trailer. A.M. noted, though, that Carthell answered the door and that A.M. did not exit her car. A.M. dropped off J.M. around 5:00 p.m., and J.M. returned home around 8:30 p.m. accompanied by the Defendant and Carthell. The Defendant gathered all of J.M.'s video games and left.

A.M. did not worry about J.M.'s being at the trailer or about Carthell's presence at the trailer. A.M. did not remember J.M.'s telling her "several times" that he was being molested; she noted, though, that "[he] may have said it in a way that [she] just didn't get it."

A.M. testified that she had a key to her work and that the Defendant sometimes borrowed the key in order to open the building if he arrived before A.M. A.M. denied that the Defendant took J.M. with him in the mornings because J.M. was generally going to school at that time. A.M. did not have a key to the day care building.

A.M. was not aware of J.M.'s testimony that he and the Defendant had sex while A.M. was in another room of the house. When asked whether she would have noticed a change in J.M.'s behavior after such an incident, A.M. answered negatively. Relative to the Defendant's watching pornography, A.M. recalled an incident in which she awoke at 1:00 a.m., noticed that the Defendant was not in bed, and found the Defendant and J.M. in the living room watching pornography. She and the Defendant argued.

A.M. testified that the Defendant and J.M. went out alone to go fishing and do other activities, and sometimes, they would also stay at the house alone. A.M. stated that the Defendant did not like the children to use the internet because they watched pornography. A.M. said that J.M. did not have disciplinary problems at his school in Chicago. A.M. acknowledged that although it was possible J.M. was treated for constipation in Tennessee, "it wasn't that severe." A.M. stated that J.M. had been in trouble at school in Wisconsin for "acting out," specifically that he did not "sit down" or pay attention for very long. A.M. later said, though, that J.M.'s school trouble in Wisconsin was based upon his not keeping up with the rest of his class. A.M. agreed that J.M.'s trouble in school in Tennessee also sometimes involved the same behaviors.

-17-

On redirect examination, A.M. testified that J.M. received his PlayStation 3 in December 2014. On several occasions, the Defendant took J.M.'s video games and consoles to the trailer as a punishment and gave them back after two or three weeks. A.M. was not aware that one of the rules of the sex offender registry was that the Defendant could not have internet service at his home. A.M. stated that they had internet at all of their houses. A.M. agreed that this would explain why the Defendant was "nervous" about having the internet. A.M. noted that she and the Defendant used the internet together. On recross-examination, A.M. testified that the Defendant used the internet more than once and asked for her help in using the computer. A.M. knew which websites the Defendant visited, although she did not stay in the room while he used the computer.

Ripley Middle School Principal Latonya Jackson testified that J.M. was a student at her school for one and one-half years and that the Defendant came to the school for parent-teacher conferences, parent nights, and individualized education plan meetings. He also mentored other students and ate lunch with J.M. and his friends. Ms. Jackson estimated that the Defendant had contact with four students including J.M. Ms. Jackson learned in the summer of 2014 that the Defendant was a registered sex offender and placed him on a list of people not allowed to be on school grounds. Ms. Jackson identified a copy of J.M.'s school records, in which the Defendant was listed as an emergency contact. Generally, a sex offender was supposed to notify the school of his status and get approval to visit his biological child. Alternatively, a court order would allow a sex offender to visit a non-biological child. The Defendant never notified the school of his status.

On January 16, 2015, a "manifestation determination" meeting[6] was held to determine if J.M.'s disability was causing his problematic behaviors. J.M. was sleeping in class and acting aggressively; the aggression was not typical of his behavior, although he had slept in class the previous year. They asked J.M. why he was acting this way; J.M. said, "The trailer"; Ms. Jackson turned to A.M.; and A.M. said, "He says my husband is raping him." Ms. Jackson called in the school resource officer and took J.M. to a conference room alone. J.M. told Ms. Jackson that A.M. "had been taking him to the trailer and that [the Defendant] had been sexually abusing him." J.M. stated that the abuse had been happening since second or third grade. J.M. began going into some detail about "where some Vaseline was located," and Ms. Jackson left because she thought J.M.

---

[6] Manifestation determination meetings and individualized education plan (IEP) meetings are required to be provided to students identified as having a disability under federal law. Although A.M. expressed an opinion that J.M. had attention deficit hyperactivity disorder (ADHD), she later testified that he did not have an ADHD diagnosis, and no other testimony was given regarding J.M.'s disability.

would be more comfortable speaking with males. J.M. was transferred to a different school.

On cross-examination, Ms. Jackson testified that although the outcome of the meeting had not been determined when it ended, there was a "distinct possibility" that J.M. would have been sent to an alternative school. Ms. Jackson stated that when she discussed J.M.'s sleepiness with A.M., they did not discuss J.M.'s playing video games all night as a possible cause, and instead only discussed medications he took. Ms. Jackson further stated that to her knowledge, the Defendant did not harm any children when he visited the school. On redirect examination, Ms. Jackson estimated that the Defendant came to the school more than ten times.

Lauderdale County Sex Offender Registry Coordinator Amy Northcott testified that she first met the Defendant on August 7, 2012, when he moved to Lauderdale County from Dyer County. Ms. Northcott identified the Defendant's Dyer County sex offender registration form listing his previous convictions, "first and second sexual assault" of an eight-year-old female victim in 1991, and "first and second sexual assault" of a twelve-year-old female victim in 1989, both in Madison, Wisconsin.[7] The Defendant signed a form affirming that he had read or was explained the rules of being on the sex offender registry and that he agreed to abide by those rules. One of the enumerated rules was as follows:

> [N]o sexual offender . . . whose victim was a minor shall knowingly reside with a minor. An offender may reside with a minor if the offender is the parent of the minor . . . . [P]arent shall not include stepparent if the offender's victim was a minor less than [thirteen] years of age.

When Ms. Northcott asked the Defendant if any minors were living in his home, the Defendant answered, "Just my kids." Ms. Northcott asked, "Are they your kids?" The Defendant answered, "They are my kids." Ms. Northcott reviewed the rules regarding stepparents with the Defendant and used the word "biological" in reference to children, and the Defendant informed Ms. Northcott that the children were his. Ms. Northcott accepted his answer.

Ms. Northcott noted that the Defendant was classified as a violent sexual offender and required to register quarterly. A quarterly visit involved reviewing the Defendant's

---

[7] Certified copies of the judgments reflected that in both cases, the Defendant pled no contest and was found guilty by the trial court. The 1991 conviction was for "first degree sexual assault of a child" and the 1989 conviction was for "sexual assault." Defense counsel objected to entry of the judgment forms, arguing that according to Wisconsin law, a no-contest plea was not admissible in later civil or criminal proceedings. The trial court overruled the objection.

contact information and address, and he signed a new copy of the rules. Once the rules were updated electronically, the Defendant would have signed annually and have been notified to re-sign any changes to the rules as they were passed. Regarding his residence, the Defendant listed the Main Street address on September 24 and December 11, 2012, and April 1 and June 27, 2013. In August 2013, the Defendant reported that he had moved to the College Street house.[8] On March 19 and June 25, 2014, the Defendant listed the Spring Street address. On September 25, 2014, the Defendant listed the trailer's address.

In September 2014, Ms. Northcott received a call from a school inquiring about the Defendant's being on the sex offender registry and wanting to know the conditions under which he could come onto school property. Ms. Northcott told the school that a sex offender could drop off and pick up biological children and attend parent-teacher conferences only after informing the school in writing of the sex offender's status and obtaining permission from the school. The school informed Ms. Northcott that the Defendant was listed as a stepparent. Ms. Northcott did not know until this conversation that the Defendant was not the children's biological parent. She requested a copy of the school's records and obtained a warrant regarding the sex offender registry violation. The Defendant was arrested, posted bond, and reported back to Ms. Northcott with a new address on September 25.[9] Ms. Northcott believed that the Defendant had a "clear understanding" that he could not live with or spend the night with his stepchildren, whether at the trailer or the Spring Street house.

On January 16, 2015, Investigator Hickman informed Ms. Northcott that the Defendant had been allowing his juvenile stepson to spend the night at the trailer. Ms. Northcott called the Defendant, and he told her that he was out of town but would visit her the following Monday. The Defendant did not come in voluntarily, and Investigator Hickman picked him up and brought him to Ms. Northcott's office. Ms. Northcott obtained a second warrant relative to J.M.'s spending the night at the trailer. Ms. Northcott accompanied Investigator Hickman to the trailer and assisted in executing the search warrant. Ms. Northcott searched for evidence that children were spending the night there and found bunk beds, masks, wigs, gaming systems with games, a helium tank for balloons, jars of candy, Lego toys, curtains for a child's bedroom, and a dresser "full of kids' clothes [and] underwear[.]"

On cross-examination, Ms. Northcott testified that she was unaware that Carthell also lived at the trailer until they arrived to execute the search warrant. Ms. Northcott stated that Carthell was present during the search and saw the items that were collected and photographed. She denied that Carthell identified any of the items as belonging to

---

[8] The Defendant also listed the College Street address in September and December 2013.
[9] The Defendant also listed the trailer's address on December 10, 2014.

him rather than to the Defendant. Ms. Northcott was not aware that "a young lady moved into Carthell's trailer . . . and she had young children." Ms. Northcott stated, though, that Carthell was also a registered sex offender and that as a result, he also was not permitted to have overnight guests who were minors.

Ms. Northcott testified that it was the Defendant's responsibility to ensure that no items were in the house to indicate children were staying overnight or to "lead anybody to believe that there were children over there[.]" Ms. Northcott stated that if the Defendant believed he had told her the children were his stepchildren, he would be mistaken. She noted that she would not have allowed him to register at the same address as the children. Ms. Northcott noted that although the paperwork did not have space for a statement regarding children, she was required to ask if there were minors in the home; the Defendant answered verbally that he lived with his wife and children. Due to a lack of resources and personnel, Ms. Northcott did not conduct a home visit with the Defendant before she was notified that there was a problem in January 2015.

In January 2015, Ms. Northcott was only notified that J.M. had spent the night at the Defendant's trailer, and she did not know about the abuse allegations. When asked whether Ms. Northcott "picked up the phone to talk to [the Defendant's] wife . . . to find out whether or not [the children] were his stepchildren," Ms. Northcott responded that she was not required to do such. Ms. Northcott noted that falsifying a record was a violation of the sex offender registry requirements. Ms. Northcott acknowledged that according to the paperwork on file, the Defendant had reported as required.

Tyra Reed testified for the defense that she had two children who were friends with J.M. Ms. Reed stated that her children were not present for "that event" on January 14, 2015. On cross-examination, Ms. Reed stated that at the time of trial, her sons were ages fourteen and eleven and that they used to go to the trailer to "hang out." Ms. Reed did not recall how many times they went to the trailer, but she stopped them from going in November of an unspecified year because she received a telephone call saying that the Defendant was a sex offender. She was unaware of the Defendant's status before that point. Ms. Reed worked from 7:30 a.m. to 3:30 p.m. and would allow her sons to go out and play with friends. Before November, Ms. Reed lived on Spring Street near J.M., but after November her family moved "further into the country," meaning that her sons would get off the school bus and come straight home. Before that time, her sons went to the Defendant's trailer "pretty regular[ly]."

Danny Akins, the Defendant's nephew, testified that he lived in Madison, Wisconsin and that although he did not know J.M., he was connected with J.M. on social media and had spoken to him by telephone. Mr. Akins stated that J.M. told him that the reason he alleged the abuse was because "he didn't want his stepfather and his mother together." Mr. Akins said that he did not have any problems staying with the Defendant,

-21-

which he had done in the past. On cross-examination, Mr. Akins stated that he would not want "a rapist" in his home.

Gloria Bennett, the Defendant's sister, testified that she did not call A.M. in regard to J.M.'s case or offer A.M. $5,000 for J.M. to change his testimony. She stated that no one in her family had $5,000. On cross-examination, Ms. Bennett stated that she did not speak to A.M. When asked whether "a lot of [her] family members" had been calling A.M. and telling her and J.M. not to testify, Ms. Bennett stated that she "[didn't have] nothing to do with that" behavior. Ms. Bennett denied telling A.M. that the allegations "should have been kept in the family."

Carthell Williams, the Defendant's brother, testified that he entered a no-contest plea in Wisconsin twenty years previously, that he was not required to register as a sex offender in Wisconsin, and that he was not aware that he had to register in Tennessee until the trailer was searched in January 2015. The Defendant lived with Carthell on January 14, 2015, when A.M. dropped off J.M. in order for the Defendant to discipline J.M. for "being bad in school[.]" Carthell drove to a corner store for five to seven minutes; when he returned, the Defendant was sitting on the couch and J.M. was sitting at the table, eating and watching television.

Carthell testified that when he arrived at the trailer during the execution of the search warrant, he asked to see the warrant but was "ignored." Carthell slept in the master bedroom and had been visited by his grandchildren before he was on the sex offender registry. To Carthell's knowledge, he had never had other children at the trailer. He said, though, that Ms. Reed stayed at the trailer with her three elementary and middle school-aged children for about three months; the children left some belongings behind. Carthell intended to give the items back to Ms. Reed, but the police collected them before he "got around to" it.

On cross-examination, Carthell stated that Ms. Reed moved into the trailer in August or September 2014 and moved out in November 2014. Carthell did not remember when the Defendant moved in with him and noted that he had trouble remembering things due to a blood clot in his brain. Carthell acknowledged that he had previous convictions in Wisconsin for fourth degree sexual assault and third degree sexual assault, but he did not remember a conviction for "injury by . . . neglectful use of a weapon." In Tennessee, Carthell had two convictions for possession of a firearm by a convicted felon "with violent priors" and one conviction for failure to timely report as a sex offender. Carthell acknowledged that he had been in Tennessee for about five years before he registered as a sex offender.

Relative to January 14, 2015, Carthell testified that he bought chips and soda at the corner store and that he did not visit his girlfriend. Carthell acknowledged that he

communicated with A.M. and J.M. through his girlfriend.  When asked whether he told his girlfriend to tell A.M. and J.M. not to "come down here" for trial, Carthell responded, "I didn't tell [my girlfriend] to tell them.  I told [my girlfriend.]"  Carthell denied telling A.M. and J.M. that they would be locked up and calling A.M. after the preliminary hearing.  Carthell agreed that although he did not remember events from one week before trial, he remembered events occurring two and one-half years ago.

On redirect examination, Carthell testified that he did not write a contemporaneous statement regarding J.M.'s allegations.  He stated, though, that he had written a contemporaneous statement to help him remember the relevant events.  Carthell acknowledged that Ms. Reed could have stayed at the trailer in August 2013 instead of August 2014.

On recross-examination, Carthell identified a copy of his lease at the trailer, which reflected a move-in date of May 8, 2014.  On further redirect examination, Carthell agreed that although the Defendant's name was on the lease, the Defendant did not move into the trailer until Carthell had been living there a couple "years."

At the close of proof, the State made the following elections[10]:

| Count | Elected Date | Elected Event |
|---|---|---|
| 1 (rape)<br>2 (aggravated statutory rape)<br>3 (statutory rape by authority figure)<br>4 (sexual battery by authority figure)<br>5 (incest) | 1/14/15 | "In Back Bedroom in White Trailer on Webb Ave[.][the Defendant]told [J.M.] to sit on his penis after [the Defendant]had applied petroleum jelly.  [J.M.] sat on [the Defendant's] penis while Kenney was sitting on the bed.  [J.M.'s] back was to [the Defendant]." |
| 6 (rape)<br>7 (aggravated statutory rape)<br>8 (statutory rape by authority figure)<br>9 (sexual battery by authority figure)<br>10 (incest) | 1/14/15 | "In Back Bedroom in white trailer on Webb Ave[.]  [The Defendant] put his mouth on [J.M.'s] penis." |
| 11 (rape)<br>12 (aggravated statutory rape) | 1/14/15 | "In back bedroom in white trailer on Webb Ave[.]  [The Defendant] told |

---

[10] The State dismissed one count each of rape; aggravated statutory rape; statutory rape by an authority figure; and sexual battery by an authority figure; thirty-three counts of rape of a child and aggravated sexual battery; and thirty-four counts of incest.

-23-

| | | |
|---|---|---|
| 13 (statutory rape by authority figure)<br>14 (sexual battery by authority figure)<br>15 (incest) | | J.M. to get on the bed in dog position and [the Defendant] put his Penis in [J.M.'s] butt." |
| 48 (rape of child)<br>49 (incest)<br>50 (aggravated sexual battery) | Between 1/21/14 and 9/22/14 | "On Spring St[.], in [J.M.'s] Bedroom [J.M.] was on his back on the floor[. The Defendant] put petroleum jelly on penis[. The Defendant] put penis in [J.M.'s] bottom." |
| 51 (rape of child)<br>52 (incest)<br>53 (aggravated sexual battery) | Between 1/21/14 and 9/22/14 | "On Spring St[.], in [J.M.'s] bedroom[. J.M.] put his mouth on [the Defendant's] penis." |
| 54 (rape of child)<br>53 (incest)<br>56 (aggravated sexual battery) | Between 1/21/14 and 9/22/14 | "On Spring Street, in the basement, [the Defendant] took two covers down to the basement and put them on the floor. [The Defendant] put grease on his penis. [The Defendant] put his penis in [J.M.'s] butt." |
| 57 (rape of child)<br>58 (incest)<br>59 (aggravated sexual battery) | Between 1/21/14 and 9/22/14 | "On Spring Street, in the basement, [the Defendant] took two covers down to the basement. [The Defendant] put his mouth on [J.M.'s] penis." |
| 60 (rape of child)<br>61 (incest)<br>62 (aggravated sexual battery) | Between 1/21/14 and 9/22/14 | "On Spring Street, in the basement, [the Defendant] took two covers down to the basement. [J.M.] put his mouth on [the Defendant's] penis." |
| 69 (rape of child)<br>70 (incest)<br>71 (aggravated sexual battery) | Between 8/2/13 and 1/20/14 | "Happened when was living on College Street but did not happen at the house. It happened at Mom's job . . . . In a white building, on a long couch [the Defendant] put Cocoa Butter on his penis and told [J.M.] to sit on his penis. [J.M.] had his back to [the Defendant]." |
| 105 (rape of child) | Between | "On Main St[.], in [A.M.'s] |

| 106 (incest) 107 (aggravated sexual battery) | 8/21/12 and 8/1/13 | bedroom. [A.M.] was doing sister's hair in the front room. [The Defendant] and [J.M.] were in his mom's bedroom. [The Defendant] told [J.M.] to sit on his penis. There was no grease used. Both of their closed were slid down[. The Defendant] put his penis [through] the slit in the boxers." |
| 108 (rape of child) 109 (incest) 110 (aggravated sexual battery) | Between 8/21/12 and 8/1/13 | "On Main St[.], everybody had gone to church but [J.M. and the Defendant. The Defendant] had told [A.M.] that [J.M.] was sick. That he had been throwing up. [J.M.] was told to get in the dog position. One leg off couch and one on the couch. This occurred on the brown couch. No grease was used. [The Defendant] put his penis in [J.M.'s] butt." |

C. <u>Verdict, Sentence, and Appeal</u>.  The jury found the Defendant guilty as charged.  At the sentencing hearing, the trial court merged the convictions as follows:

| Count | Conviction | Action |
|---|---|---|
| **1** | **Rape** | |
| 2 | Aggravated statutory rape | Merged with Count 1 |
| 3 | Statutory rape by authority figure | Merged with Count 1 |
| 4 | Sexual battery by authority figure | Merged with Count 1 |
| 5 | Incest | Merged with Count 1 |
| **6** | **Rape** | |
| 7 | Aggravated statutory rape | Merged with Count 6 |
| 8 | Statutory rape by authority figure | Merged with Count 6 |
| 9 | Sexual battery by authority figure | Merged with Count 6 |
| 10 | Incest | Merged with Count 6 |
| **11** | **Rape** | |
| 12 | Aggravated statutory rape | Merged with Count 11 |
| 13 | Statutory rape by authority figure | Merged with Count 11 |
| 14 | Sexual battery by authority figure | Merged with Count 11 |

| | | |
|---|---|---|
| 15 | Incest | Merged with Count 11 |
| **48** | **Rape of a Child** | |
| 49 | Incest | Merged with Count 48 |
| 50 | Aggravated sexual battery | Merged with Count 48 |
| **51** | **Rape of a Child** | |
| 52 | Incest | Merged with Count 51 |
| 53 | Aggravated sexual battery | Merged with Count 51 |
| **54** | **Rape of a Child** | |
| 55 | Incest | Merged with Count 54 |
| 56 | Aggravated sexual battery | Merged with Count 54 |
| **57** | **Rape of a Child** | |
| 58 | Incest | Merged with Count 57 |
| 59 | Aggravated sexual battery | Merged with Count 57 |
| **60** | **Rape of a Child** | |
| 61 | Incest | Merged with Count 60 |
| 62 | Aggravated sexual battery | Merged with Count 60 |
| **69** | **Rape of a Child** | |
| 70 | Incest | Merged with Count 69 |
| 71 | Aggravated sexual battery | Merged with Count 69 |
| **105** | **Rape of a Child** | |
| 106 | Incest | Merged with Count 105 |
| 107 | Aggravated sexual battery | Merged with Count 105 |
| **108** | **Rape of a Child** | |
| 109 | Incest | Merged with Count 108 |
| 110 | Aggravated sexual battery | Merged with Count 108 |
| **144** | **Sex Offender Registry Violation** | |
| **145** | **Sex Offender Registry Violation** | |

After merger, the remaining convictions reflected three convictions for rape, a Class B felony; eight convictions for rape of a child,[11] a Class A felony; and two counts of violating the sex offender registry, a Class E felony.

The trial court found that the Defendant was convicted in 1991 of sexual battery in Wisconsin and "received a conviction of first degree sexual assault of a child," for which he had received a twelve-year sentence, to be served consecutively to another sentence he was serving. In 1990, the Defendant was convicted of "possession or receiving or selling" a stolen vehicle, for which he received thirty months' probation. In 1989, he was

---

[11] Six counts related to the events at the Spring Street address and A.M.'s workplace, and two counts related to the events at the Main Street address.

convicted of sexual assault, for which received a three-year sentence, to be served in confinement for ninety days and the remainder on probation. That court ordered the Defendant not to have contact with juveniles. The Defendant's prior sex offenses involved his twelve-year-old niece and an eight-year-old "female friend."

The trial court sentenced the Defendant to twelve years each for the rape convictions in Counts 1, 6, and 11 as a Range II, multiple offender, which carried statutory 100% service. The court ordered concurrent service of the sentences. The court sentenced the Defendant to twenty-five years each for the rape of a child convictions in Counts 48, 51, 54, 57, 60, and 69. The court noted that the statute mandated a Range II sentence regardless of the Defendant's range classification. The court ordered the rape of a child sentences to run concurrently with one another and consecutively to Counts 1, 6, and 11. The court sentenced the Defendant to twenty-five years each for the rape of a child convictions in Counts 105 and 108.[12] The court ordered the sentences to run concurrently with one another and consecutively to Counts 48, 51, 54, 57, 60, and 69. The court sentenced the Defendant to two years for each of the sex offender registry convictions in Counts 144 and 145, to run concurrently with one another but consecutively to all other counts. The court stated that the Defendant was not eligible for probation or community corrections.

The trial court found by a preponderance of the evidence that the Defendant was an offender with a record "of criminal activity of abusing children, worse than abusing children. It is extensive. He's a dangerous offender who indicates [] little or no regard for the rights of children or the ability of children to remain free from his type of being a predator." The court also found that consecutive sentencing was reasonably related to the severity of the offenses committed and served to protect the public or society, "especially children, from further criminal activity by someone who has resorted to the same kind of conduct in the past, served a penitentiary sentence, released, and immediately takes it back up[.]" The court stated that the sentences were "congruent with the general principles of sentencing" and that the Defendant had been convicted of two or more offenses involving sexual abuse of a minor. The court considered "aggravated circumstances arising from the relationship between the [D]efendant and the victim; and that the timespan of the [D]efendant's undetected sexual activity, the nature and scope of the sexual activity, and the extent of the residual, physical, and mental damage to the victim was severe[.]" The Defendant's total effective sentence was sixty-four years.

The Defendant's motion for new trial raised as issues the sufficiency of the evidence, the qualification of Ms. Walker as an expert witness, and the lack of notice regarding her expert testimony. The Defendant argued that

---

[12] The court did not articulate the length of sentence for Count 108, only that Counts 108 and 105 would run concurrently. However, the judgment form for Count 108 reflects a twenty-five-year sentence.

testimony given by [J.M.] regarding the incident that occurred in [sic] does not explain the injuries observed by Tracey [sic] Walker on January 16, 2015. Further [J.M.] first testified that he had no memory of any event that occurred when he lived on College Street, and then testified related to an incident which . . . occurred at a time and place that, according to [A.M.'s] testimony was not available, and further he did not accurately describe the place where the incident was supposed [sic] to have occurred.

At the motion for a new trial hearing, the Defendant argued that he did not have notice of the proposed expert and that as a result, he did not have time to obtain his own expert witness to testify to the existence of a third party abusing J.M. The State responded that Ms. Walker was listed on the indictment as an "RN SANE nurse" and that the Defendant was on notice that she would testify.

The trial court denied the motion by written order, finding that the evidence was sufficient to support the convictions.[13] The court approved and concurred in the jury's verdict, noting that the jury accredited the State's witnesses. Relative to Ms. Walker, the court found that Ms. Walker's name and qualifications appeared on the indictment, giving adequate notice that she would testify. The court noted that defense counsel was not the Defendant's first attorney in this case and that counsel never filed a discovery request relative to Ms. Walker's testimony.[14] The court also noted that the Defendant did not present proof of any third party to blame for J.M.'s abuse and that the motion for a new trial was the first time he had espoused this theory.

## ANALYSIS

On appeal, the Defendant argues (1) that the evidence was insufficient to support his convictions for rape and rape of a child; (2) that the trial court erred by admitting evidence of the Defendant's prior bad acts; (3) that admission of the victim's entire medical record was improper because it was prepared for the purposes of prosecution and contained hearsay statements; (4) that the trial court erred by qualifying Ms. Walker as an expert witness; (5) that the court erred by not declaring a mistrial after it became apparent that a video recording of J.M.'s forensic interview had not been provided to the defense; (6) that the court erred by failing to sever the sex offender registry charges; and (7) that the court erred in its application of "certain enhancement factors" in sentencing and imposed an excessive sentence. We will address each issue in turn.

---

[13] Sufficiency of the evidence was not discussed at the hearing.

[14] The record reflects that on August 18, 2015, the Public Defender's Office filed a motion for discovery in this case.

# I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions for rape and rape of a child.[15] The State responds that the Defendant's objections relate only to the credibility of the witnesses and that when viewed in the light most favorable to the State, the evidence was sufficient to support the Defendant's convictions. We will address each of the Defendant's specific arguments, which have been consolidated and reordered for clarity, in turn.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

In relevant part, rape is defined as the "unlawful sexual penetration of a victim by the defendant or of the defendant by a victim . . . without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent." Tenn. Code Ann. § 39-13-503(a)(2). Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if

---

[15] We note that although the Defendant listed sufficiency of the evidence relative to all his convictions in the table of issues in his brief, the argument section of both his brief and reply brief only address the rape and rape of a child convictions.

the victim is more than three (3) years of age but less than thirteen (13) years of age."
Tenn. Code Ann. § 39-13-522(a).

### 1. Evidence of lack of consent

The Defendant contends that no evidence was presented of a lack of consent by J.M. relative to the rape convictions, arguing that J.M. never "claim[ed] that he was raped" and that J.M. complied with requests the Defendant made of him. The issue of consent is a question resolved by the finder of fact. Haynes v. State, 540 S.W.2d 277, 278 (Tenn. Crim. App. 1976). The State responds that there was sufficient evidence of a lack of consent as well as coercion by the Defendant, citing to the statutory definition of coercion found in Tennessee Code Annotated section 39-13-501(1).

The indictments in Counts 1, 6, and 11 for rape specified that sexual penetration occurred without J.M.'s consent. The State did not pursue a theory of coercion at trial, and it may not change theories on appeal.

We note that although the Defendant in his brief discusses consent for every instance of sexual abuse, the State's election for the rape convictions was specific to the event on January 14, 2015. J.M. testified that the Defendant "told" J.M. to perform various sex acts and that J.M. complied. J.M. and A.M. both testified that the Defendant was the disciplinarian of the household. J.M. stated that the Defendant "whipped" him with a belt in response to his having gotten into trouble at school. J.M.'s medical records indicated that J.M. reported being intimidated by the Defendant. Moreover, J.M. testified that anal penetration "d[id]n't feel right" and sometimes hurt him. We feel constrained to note that non-resistance is not proof of consent. Lundy v. State, 521 S.W.2d 591, 594 (Tenn. Crim. App. 1974); State v. Wade Henry Allen Marsh, No. E1998-00057-CCA-R3-CD, 2000 WL 555231, at *3 (Tenn. Crim. App. May 8, 2000). Ms. Walker testified that when she examined J.M. two days after the incident, she observed a three and one-half-inch tear at the top of J.M.'s buttocks consistent with them having been forcefully "jerked" apart. Although she did not observe fresh anal wounds, Ms. Walker also testified that the anal skin tags were consistent with J.M.'s having undergone more than fifty traumatic penetrations, which would have been exacerbated by his resisting the penetrations. The evidence was sufficient for the jury to find that J.M. did not consent to the Defendant's anally penetrating him. The Defendant is not entitled to relief on this basis.

### 2. Witness credibility

The Defendant argues that J.M. was not credible, as demonstrated by the lack of DNA evidence, various defense witnesses' inconsistent testimony regarding the sequence of events on January 14, 2015, J.M.'s needing to be reminded of his previous statements,

J.M.'s watching pornography, J.M.'s delay in disclosing the abuse, and J.M.'s motivation to avoid going to an alternative school and to separate the Defendant and A.M. The Defendant also asserts that logical inconsistencies in J.M.'s account of events[16] and the appearance that he was coached by the prosecutor and A.M.[17] cast reasonable doubt on the Defendant's guilt.

The Defendant further argues that Investigator Hickman was not credible because Carthell testified he was not shown the search warrant. Finally, the Defendant argues that Ms. Walker was not credible because J.M. did not report a traumatic event causing the wound she observed on J.M.'s buttocks; Ms. Walker did not consider J.M.'s previous constipation issues in her examination; and Ms. Walker's agreement with a statement by defense counsel "debunk[ed]" the notion that J.M. "did not willingly allow [anal] penetration."

Issues of witness credibility are the province of the finder of fact, and we will not reweigh the evidence or disturb the jury's determinations of credibility on appeal. The jury, by its verdict, resolved any inconsistencies in the testimony, including the factual points identified by the Defendant, in favor of the State. We note that the jury is free to discredit portions of witness testimony without discrediting all of the testimony.

We note that the Defendant's argument relative to J.M.'s delay in disclosing the abuse is contrary to common knowledge regarding child sexual abuse. Victims of sexual abuse can take years to disclose their abuse, particularly when an abuser is a family member. See Kennedy v. Louisiana, 554 U.S. 407, 444-45 (2008) ("[O]ne of the most commonly cited reasons for nondisclosure is fear of negative consequences for the perpetrator, a concern that has special force where the abuser is a family member") (citing Goodman-Brown, Edelstein, Goodman, Jones, & Gordon, Why Children Tell: A Model of Children's Disclosure of Sexual Abuse, 27 Child Abuse & Neglect 525, 527-528 (2003); Smith [et al., Delay in Disclosure of Childhood Rape: Results From a National Survey, 24 Child Abuse & Neglect 273, 278-279 (2000)], 283–284 (finding that, where there was a relationship between perpetrator and victim, the victim was likely to keep the abuse a secret for a longer period of time, perhaps because of a "greater sense of

---

[16] Specifically, the Defendant argues that relative to the incident in A.M.'s bedroom, "[t]here is reasonable doubt that [the] Defendant would rape his stepson while his mother and sister were in the home and would not bother locking the door[.]" Relative to the incident in A.M.'s workplace, he argues that the Defendant did not have a key to the white building and that the incident could have occurred after J.M.'s thirteenth birthday because A.M. worked at the same location after that date.

[17] The Defendant argues that J.M. was coached by the prosecutor because he did not know the term "petroleum jelly" before trial preparation and that because A.M. was the first person to suggest J.M. had been molested, J.M. fabricated the allegations after "coaching occurred over a long period of time" in the form of A.M.'s asking if J.M. was being molested.

loyalty or emotional bond")). The sexual abuse in this case was complicated by the fact that J.M. both had a close relationship with the Defendant and was intimidated by him. A.M. and J.M. testified that he and the Defendant spent time together often and went fishing. A.M. testified that J.M. loved the Defendant and referred to him as "dad." J.M.'s medical record also noted that J.M. was intimidated by the Defendant, as borne out by J.M. and A.M.'s testimony that the Defendant was the family disciplinarian and "whipped" J.M. with a belt. We further note that although some five years passed between the first instance of sexual abuse and J.M.'s disclosure, the abuse was ongoing, and the disclosure occurred one day after the last instance of abuse.

Finally, we note that contrary to the Defendant's characterization of Ms. Walker's testimony, the record reflects that Ms. Walker repeatedly stated that J.M. would not have been able to pass bowel movements of such a size to cause the scarring she observed and that any such bowel movements would have caused obstructions necessitating surgical intervention. We note that although J.M. had been treated for chronic constipation in Wisconsin, A.M. testified that his issues with constipation improved in Tennessee and that she did not recall his having to be treated for constipation, only heartburn, after the family moved.

Similarly, the comment that the Defendant cites as "debunk[ing]" J.M.'s lack of consent was, when read in context, an affirmation by Ms. Walker that she has not seen anal scarring in an adolescent boy before, not an agreement that the scarring was evidence on a consensual relationship. Ms. Walker testified that she did not "know of many [thirteen]-year-old boys who sit and willfully allow someone to forcefully penetrate their anus causing chronic tearing, which in turn causes the scar tissue to form." Defense counsel responded, "As a matter of fact, you only know one; is that correct? [J.M.]?" Ms. Walker answered, "Absolutely." Defense counsel continued, "All right. Because the other two [boys Ms. Walker had examined] didn't have that?" Ms. Walker responded, "No." Ms. Walker's remaining testimony firmly established her opinion that repeated, traumatic penetration of the anus had occurred. Further, the Defendant's theory at trial was not that he had a consensual sexual relationship with his stepson, but rather that he did not have sexual contact with J.M. The Defendant is not entitled to relief on this basis.

### 3. The Defendant's cooperation

The Defendant argues that the evidence was insufficient to support his convictions because he "willingly showed" to speak to Investigator Hickman and was "one hundred percent" cooperative in giving a DNA sample. Aside from the fact that the Defendant mischaracterizes the testimony in this regard,[18] in light of the other evidence and

---

[18] Ms. Northcott and Investigator Hickman both testified that the Defendant did not meet with them when he said he would and eventually had to be arrested at his attorney's office.

testimony at trial, there was sufficient evidence for the jury to have found the Defendant guilty of the offenses notwithstanding any cooperation with law enforcement. The Defendant is not entitled to relief on this basis.

### 4. Proof of J.M.'s Age/Election of Offenses

The Defendant argues that the evidence was insufficient to establish J.M.'s age for the rape of a child convictions stemming from the following incidents: (1) the rape at A.M.'s workplace in the white building on a couch, which occurred between August 2, 2013, and January 20, 2014 ; (2) the rape of a child in the Spring Street house in J.M.'s bedroom, which was listed in the indictment as occurring prior to September 22, 2014; (3) the rape of a child in the Spring Street house in the basement, which was listed in the indictment as occurring prior to September 22, 2014. The State responds that the evidence was sufficient to support the convictions. Relative to the Spring Street incidents, the State cites J.M.'s testimony to establish that the incidents occurred while the Defendant was still living with the family.

Even though the Defendant does not discuss in his brief the sufficiency of the evidence regarding the other convictions arising from these three incidents, because J.M.'s age is also relevant to the aggravated sexual battery convictions,[19] we will consider the proof as it relates to both rape of a child and aggravated sexual battery.

In addition, in the context of sufficiency of the evidence, we must also examine an interrelated issue regarding proof of the State's elected dates of the offenses. The State's elected date range is relevant to all the convictions—rape of a child, aggravated sexual battery, and incest—arising from these three incidents.

As stated above, rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). Proof of the victim's age is an element of the offense and must be proven beyond a reasonable doubt.

Aggravated sexual battery is defined, in relevant part, as the "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [when the] victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a). The indictments in this case reflect that the State elected J.M.'s age as the basis for the aggravated sexual battery charges. Incest is defined, in relevant part, as sexual

---

[19] The indictments in Counts 50, 53, 56, 59, and 62 specify that the sexual contact occurred when J.M. was less than thirteen years of age.

-33-

penetration when the defendant knows the victim is his or her stepchild. Tenn. Code Ann. § 39-15-302(a)(2).

J.M.'s date of birth was December 14, 2001, meaning that his thirteenth birthday was December 14, 2014. It is undisputed that the Defendant was J.M.'s stepfather at the time the incidents occurred.

Our supreme court "has consistently held that the prosecution must elect the facts upon which it is relying to establish the charged offense if evidence is introduced at trial indicating that the defendant has committed multiple offenses against the victim." State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001). "The election requirement safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." Id. at 631. A critical reason for an election is to protect a defendant against "patchwork verdicts." State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993).

> [T]he election requirement has been applied almost exclusively in the sex crimes context, and specifically, when the defendant is alleged to have committed a series of sexual acts over a lengthy period of time against young children who are unable to identify the exact date on which any one act was perpetrated.

Johnson, 53 S.W.3d at 631 (citing State v. Brown, 992 S.W.2d 389 (Tenn. 1999). After making an election, the State must prove that the offense occurred "in accordance with the election, i.e., to have occurred on [the elected] date and under [the elected] circumstances." State v. Marvin D. Nance, No. E2005-01623-CCA-R3-CD, 2007 WL 551317, at *6 (Tenn. Crim. App. Feb. 23, 2007) (citing State v. Johnny Lee Hines, No. 01C01-9709-CC-00405, 1999 WL 33107, at *4 (Tenn. Crim. App. Jan. 27, 1999)).

> Proof of the specific date of an offense is not, of course, a statutory element of an offense. Rather, the identification of, and distinction among, alleged incidents in multiple sex offense cases is required primarily to ensure unanimity of a verdict.
>
> Thus, with regard to the election of offenses, the standard for sufficiency of the evidence applies to the designation of offenses as though it were an element of the offenses. Not only must the state's election identify and distinguish offenses sufficiently to allow the trier of fact to render discrete and unanimous verdicts on each, the state must . . . support this election with evidence sufficient for a reasonable trier of fact to find that the offenses occurred as elected beyond a reasonable doubt.

Johnny Lee Hines, 1999 WL 33107, at *4; see State v. Joshua Michael Stewart, No. E2017-00864-CCA-R3-CD, 2018 WL 287178, at *5 (Tenn. Crim. App. Jan. 4, 2018).

### a. Incident at A.M.'s workplace

In the light most favorable to the State, the evidence at trial reflects that in 2014, A.M. had been working at Meals on Wheels for about two years and had a key to the building. The Defendant sometimes helped her with meal deliveries and on occasion, borrowed her key to open the building. The Meals on Wheels building was connected to a white building that housed a day care. While no one else was there, the Defendant anally penetrated J.M. on a couch in the reception area of the white building.

J.M. testified that the incident occurred while the family lived on College Street. Utility records reflected that the family moved into the College Street house on August 2, 2013, and moved out on January 21, 2014, which was before J.M. turned thirteen. The State proved J.M.'s age beyond a reasonable doubt relative to this incident.

### b. Spring Street Bedroom and Basement Incidents

Upon careful examination of the testimony and the record as a whole, in the light most favorable to the State, we conclude that the State's elected dates between which the incidents occurred were not sufficiently proven relative to two of the Spring Street incidents. In addition, J.M.'s age was not sufficiently proven.

The State's election relative to the incident in J.M.'s bedroom, which was referenced in Counts 48 and 51 (rape of a child), Counts 49 and 52 (incest), and Counts 50 and 53 (aggravated sexual battery), reflected that the event occurred between January 21, 2014, and September 22, 2014. The State's election relative to the incident in the basement at Spring Street, which was referenced in Counts 54, 57, and 60 (rape of a child), Counts 55, 58, and 61 (incest), and Counts 56, 59, and 62 (aggravated sexual battery), reflected the same time period.

In Johnny Lee Hines, which also dealt with years-long sexual abuse of a preteenager, the State's election reflected dates of offenses of March 15, June 15, May 15, and August 15, 1996. 1999 WL 33107, at *1. However, the victim's testimony only established that the abuse occurred almost daily, but not when her parents were home or she was menstruating. Id. at *4. This court concluded that "one must speculate to determine if sexual misconduct occurred on the fifteenth of any given month" and that the jury could not have concluded that the offenses occurred specifically on the dates elected; therefore, the relevant convictions were reversed and dismissed. Id.

In the present case, although the State's brief cites J.M.'s testimony that the incidents occurred while the Defendant was living at the Spring Street house, J.M. never testified to this fact. The record reflects that the prosecutor asked if each incident occurred while J.M. lived at Spring Street and he agreed, but no questions were asked regarding whether the Defendant was still living in the house or whether the events occurred prior to J.M.'s birthday in December 2014. In addition, A.M. testified that the Defendant moved to the trailer in "early spring" 2014 but continued to spend the night at the Spring Street house. She stated that the Defendant "bounced" between the trailer and the Spring Street house.

Although A.M. was informed on September 23, 2014, that the Defendant was not supposed to spend the night in the same house as her children, she was not questioned regarding whether the Defendant did, in fact, stop spending the night. A.M. agreed that after that date, she knew the children were not supposed to spend the night at the trailer, but she "ignored it," which was corroborated by Ms. Northcott's being informed in January 2015 that J.M. had been spending the night at the Defendant's trailer. There is nothing in the testimony that indicates whether A.M. also allowed the Defendant to break the sex offender registry rules in regard to spending the night at the Spring Street house. Reasonable doubt exists as to whether the Defendant was spending the night at Spring Street and perpetrating the abuse described in the bedroom and basement incidents after September 22, 2014.

In the absence of any proof of a temporal marker that confirms whether the bedroom and basement incidents occurred before the State's elected date of September 22, 2014, we cannot conclude relative to the rape of a child, aggravated sexual battery, and incest convictions in Counts 48-62 that the State has carried its burden of proving its election beyond a reasonable doubt.

We similarly cannot conclude that J.M.'s age was proven beyond a reasonable doubt relative to the rape of a child and aggravated sexual battery convictions in Counts 48, 50, 51, 53, 54, 56, 57, 59, 60, and 62. The State has, therefore, not carried its burden in proving this element, and as a result the evidence is insufficient to support the convictions.

We note that if J.M.'s age was the only element not supported by sufficient evidence, we would order reduction of the impacted convictions to the nearest lesser-included offenses supported by the proof. However, in the instant case, the State has not only failed to prove J.M.'s age, but it elected a range of dates that were not proven at trial. As a result, the evidence is insufficient to support the convictions as a whole, and they must be dismissed. See Nance, 2007 WL 551317, at *6; Hines, 1999 WL 33107, at *4. We therefore dismiss and vacate the Defendant's convictions in Counts 48, 49, 50,

51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, and 62.  We remand the case to the trial court for resentencing in light of these reversals.

## II. Rule 404(b) Evidence

The Defendant contends that the trial court erred by allowing evidence of the Defendant's prior convictions and bad acts, noting without further argument that the Defendant filed an August 17, 2015 motion in limine to exclude any references to the Defendant's prior convictions or bad acts until a hearing could be held.  The State responds that the issue has been waived because the Defendant did not identify to which evidence he objected or raise the issue in the motion for a new trial.  In his reply brief, the Defendant argues that the following bad acts were improperly admitted:  testimony regarding the Defendant's status as a sex offender; reference to the Defendant's previous driving under the influence charge; references to Investigator Hickman's being given names of additional children who were possible victims or witnesses; references to the Defendant's ankle monitor in Wisconsin; the Defendant's watching pornography with J.M.; the Defendant's inflicting corporal punishment on J.M.; and the Defendant's criminal history and sex offender status, including the details of his convictions and the ages of his victims.

Although the Defendant is correct that a motion was filed by previous defense counsel, the record contains no indication a hearing was held, and there is no order from the trial court speaking to the admissibility of the unspecified evidence.  Rule 404(b) states that the court "upon request must hold a hearing outside the jury's presence."  If the court, for reasons unknown, did not hold a pretrial hearing, it was defense counsel's duty to request a jury-out hearing at the time the evidence was proffered at trial.  Defense counsel did not pursue a jury-out hearing, nor did she lodge contemporaneous objections to bad acts evidence or raise the issue in the motion for a new trial.  See Tenn. R. App. P. 3(e) ("[N]o issue presented for review shall be predicated upon error in the admission . . . of the evidence . . . unless the same was specifically stated in a motion for new trial[.]"); Tenn. R. App. P. 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error); Tenn. R. Evid. 103(a)(1) (noting that error may not be predicated on the admission of evidence unless "a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context").  The issue, therefore, has been waived.  We will, however, examine the issue for plain error.

The doctrine of plain error applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused must not have waived the issue for tactical reasons; and

(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231. Even if all five factors are present, "the plain error must be of such a great magnitude that it probably changed the outcome of the trial." State v. Martin, 505 S.W.3d 492, 505 (Tenn. 2016).

We conclude that in the absence of a hearing transcript or an order being present in the appellate record, the record does not clearly establish what occurred in the trial court. Because the five factors for plain error relief have not been met, the Defendant is not entitled to relief on this basis.

### III. Victim's Medical Records

The Defendant contends that the trial court erred when it admitted into evidence the victim's entire medical record because it was prepared for purposes of prosecution and contained prejudicial hearsay statements. The State responds that the issue has been waived and that plain error relief is not merited.

At trial, the defense objected to introduction of the victim's medical records during Ms. Walker's testimony, arguing that they contained hearsay statements and that J.M. would testify to the records' contents. The trial court overruled the objection and allowed the reading of J.M.'s medical history "as a hearsay exception." The issue was not raised in the Defendant's motion for a new trial. The Defendant in his reply brief requests plain error review.

As a preliminary matter, the Defendant argues in his appellate brief that the records were prepared for purposes of prosecution and, therefore, were not admissible pursuant to the hearsay exception for "statements made for the purposes of medical diagnosis and treatment." Tenn. R. Evid. 803(4). The State's initial motion to admit the records cited only the hearsay exception for records created in the regular course of business, Rule 803(6), and there is no indication that the medical records exception was the basis for the trial court's ruling. Admittedly, the court did not specify upon which hearsay exception it relied in overruling the Defendant's objection. In any event, the only articulated basis for the objection was in the Defendant's September 11, 2017 motion, which stated that the document contained hearsay statements and proceeded to cite to the Confrontation Clause of the United States and Tennessee Constitutions.

The Defendant's issue with the medical record does not appear to be with the admission of the record itself, but rather the statements in J.M.'s medical history regarding the longstanding nature of his abuse. Most notably, the addendum to the examination, which was not relevant to J.M.'s medical treatment—but arguably an appropriate part of the hospital's recordkeeping—stated that J.M. had named other children the Defendant may have been molesting. Although we will not speculate regarding the viability of such a motion, the Defendant could have moved to redact these statements under Tennessee Rule of Evidence 404(b). As we have discussed above, no Rule 404(b) objection was made during the trial, and no hearing was held.

Under either theory, we conclude that plain error relief is not necessary to do substantial justice. J.M. and A.M. both testified and were available for cross-examination relative to the medical history. Defense counsel cross-examined each witness at some length and brought out inconsistencies in J.M.'s statements. Moreover, Investigator Hickman's testimony had already established that he investigated other potential victims and that the children all denied having been abused by the Defendant. This inconsistency, which potentially benefitted the Defendant, was considered by the jury relative to J.M.'s credibility, and the Defendant has not demonstrated how the outcome of the trial would have been different had the statements been redacted. The Defendant is not entitled to relief on this basis.

### IV. Expert Testimony

The Defendant contends that the trial court erred by qualifying Ms. Walker as an expert witness. The Defendant argues (1) that he was not given adequate notice of Ms. Walker's status as a proposed expert witness, her intended testimony, or her qualifications, and that as a result, the Defendant was unable to obtain an independent expert opinion; and (2) that Ms. Walker "was not an expert in the area of child abuse of victims the age and gender of" J.M. or familiar with the "effects of a long term homosexual relationship." The State responds that this issue has been waived.

Regarding the issue of notice, the record reflects that defense counsel stated that if Ms. Walker's expert testimony was "limited to what is done for the purpose of collecting evidence of sexual assault, [counsel would] accept her as [an] expert because [counsel believed she was] so trained. [Counsel did] not believe she ha[d] been trained to give a diagnosis[.]" Contrary to the Defendant's assertion, this was not a clearly stated objection on the issue of notice. Notice was raised for the first time in the motion for a new trial. Ms. Walker was listed on the indictment along with her background, which was sufficient notice that she would testify. The Defendant is not entitled to relief on this basis.

Relative to Ms. Walker's qualifications, after Ms. Walker's testimony, defense counsel lodged an objection to the trial court's qualifying Ms. Walker as an expert, stating that "she did not have the background she indicated in her voir dire[.]" The objection was overruled without further discussion. Ms. Walker testified she had been a SANE for eleven years. She had a Master's degree in nursing and was a state licensed nurse practitioner, registered nurse, and EMT. She underwent forty hours of education to be certified as a SANE. Ms. Walker also "attended numerous conferences which . . . allowed [her] to further that knowledge in countless areas." She had examined all ages of

patients in medical forensic exams and described the examination process. Ms. Walker had performed more than one hundred examinations and had testified in three trials.[20]

The Defendant offers no citation to authority, and there is none, to support his repeated assertion that Ms. Walker should not have been qualified as an expert because she was a nurse and not a doctor. Nurses, particularly nurses of advanced education and training, may be qualified by a trial court as an expert when the court finds that the nurse possesses sufficient expertise to assist the jury. See, e.g., State v. Roy D. Wakefield, No. M2005-01136-CCA-R3-CD, 2006 WL 1816323, at *13 (Tenn. Crim. App. Jun. 29, 2006) (concluding that a certified nurse practitioner and certified pediatric nurse practitioner with a master's degree who explained the medical evaluation and "detailed genital examination" process was an expert in child sexual abuse); State v. Walter Williams, No. W2009-02438-CCA-R3-CD 2011 WL 2306246, at *5-6 (Tenn. Crim. App. Jun. 7, 2011) (concluding that a nurse with a master's degree and training in child and adolescent and adult sexual assault who was a nursing professor and worked at a sexual assault resource center was an expert in child sexual abuse).

In this case, Ms. Walker had a master's degree and multiple professional certifications and state licensures, and she attended continuing education courses in addition to her forty hours of SANE coursework. The court did not abuse its discretion by certifying Ms. Walker as an expert in sexual assault examination.

Although Ms. Walker acknowledged that J.M. was the first adolescent boy she had examined in a case involving anal penetration, her opinion that J.M.'s anal opening had skin tags or scar tissue consistent with repeated trauma was supported by her training and education. Defense counsel cross-examined Ms. Walker on alternative theories of injury, including chronic constipation, and attempted to discredit her testimony. The jury had the opportunity to determine the weight it would give Ms. Walker's opinion and, by its verdict, accredited her testimony. The Defendant is not entitled to relief on this basis.

## V. Mistrial

The Defendant contends that the trial court erred by failing to declare a mistrial sua sponte after the Defendant raised an issue regarding not having received a video recording of J.M.'s forensic interview. The State responds that the Defendant did not request a mistrial or include the issue in his motion for a new trial and, therefore, it has been waived.

---

[20] We note the Defendant's contention that an expert witness must not be certified without submitting a written curriculum vitae. The Defendant has cited no authority for this novel proposition, and we can find none.

As a preliminary matter, the Defendant argues in his reply brief for the first time that defense counsel did not receive the transcript of the forensic interview before trial, in spite of a discovery motion having been filed by previous counsel. After reviewing the limited record we possess—counsel's statement at trial—it is not apparent that defense counsel did not have the transcript. Counsel's objection concerned the existence of a video recording of J.M.'s interview, and she did not claim that the entire interview was withheld. Because counsel did not raise the issue in the motion for a new trial, we have no other statements to clarify whether the transcript was properly disclosed in discovery. Therefore, the record is not clear that a discovery violation occurred in the trial court. It is also not evident that a substantial right of the Defendant was affected or that consideration of this issue is necessary to do substantial justice. The forensic interview recording was not played for the jury, the forensic interview transcript was marked for identification only and not entered as an exhibit or considered by the jury, and neither the recording nor the transcript was referred to or quoted during witness testimony. Although the Defendant argues that counsel required more time to review the transcript or recording, counsel did not request a mistrial or a continuance, and counsel similarly did not raise the issue in the motion for a new trial.

We note that although a trial court can sua sponte declare a mistrial where a manifest necessity exists to do so, there is no indication that the Defendant's not having reviewed the video recording "would prevent an impartial [jury] verdict from being reached." State v. Mounce, 859 S.W.2d 319, 321 (Tenn. 1993) (quoting Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim App. 1978)). The Defendant is not entitled to relief on this basis.

## VI. Severance

The Defendant contends that the trial court erred by failing to sever the sex offender registry charges. The State responds that the issue has been waived. We agree with the State.

Tennessee Rule of Criminal Procedure 12(b)(2)(E) states that a Rule 14 motion to sever must be raised before trial. Moreover, Tennessee Rule of Criminal Procedure 14(1) states,

> A defendant's motion for severance of offenses . . . shall be made before trial, except that a motion for severance may be made before or at the close of all evidence if based on a ground not previously known. A defendant waives severance if the motion is not timely.

Although Tennessee Rule of Criminal Procedure 12(f) allows a trial court discretion to grant a relief "for good cause" notwithstanding a party's failure to comply with Rule

-42-

12(b)'s requirement to raise "such matters . . . pretrial[,]" we read Rule 12(f), a general rule, to be limited by Rule 14(1)'s specific guidelines in regard to severance. Failure to file a pretrial motion to sever results in waiver of the issue in the absence of newly discovered grounds arising during trial. Spicer v. State, 12 S.W.3d 438, 443 (Tenn. 2000) ("Unless the defendant moves to sever the offenses prior to trial or at an otherwise appropriate time, the defendant waives the right to seek separate trials of multiple offenses").[21] The Defendant did not file a pretrial motion to sever and has therefore waived consideration of the issue.[22] He is not entitled to relief on this basis.

## VII. Sentencing

The Defendant contends that the trial court erred by applying certain enhancement factors and by not placing on the record its consideration of any mitigating factors. The State responds that the Defendant received a minimum-length sentence and that consecutive sentences were appropriate.

The Defendant was a Range II, multiple offender based upon his previous convictions. In addition, his sex offense convictions carried a mandatory Range II sentence. The Defendant received the minimum sentences for rape, rape of a child, and violation of the sex offender registry. Although the trial court did not place on the record its consideration of the enhancement and mitigating factors, insomuch as application of these factors related to the length of the Defendant's individual sentences, he was not prejudiced. The Defendant is not entitled to relief on this basis.

When reviewing a trial court's imposition of consecutive sentences, "the presumption of reasonableness applies," which gives "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." State v. Pollard, 432 S.W.3d 851, 861 (Tenn. 2013). "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." Id. at 862 (citing State v. Dickson, 413 S.W.3d 735 (Tenn. 2013)).

---

[21] We note that the Defendant discusses consolidation at some length in his reply brief. Consolidation occurs when the State seeks to try multiple indictments in one trial. Severance occurs when multiple trials are held on charges that were originally included in one indictment. Consolidation is not at issue in this case.

[22] We note that even though a trial court is permitted to raise the issue of severance in cases involving mandatorily joined counts and sever an indictment with the consent of the defendant, see Tennessee Rule of Criminal Procedure 14(b)(2)(B), a defendant loses the ability to raise the issue on appeal by not filing his or her own motion and otherwise preserving the issue. Spicer, 12 S.W.3d at 443.

-43-

In this case, the trial court found that the Defendant was an offender whose record of criminal activity was extensive and that the Defendant had been convicted of two or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances of the abuse. Tenn. Code Ann. § 40-35-115(b)(2), (5). We note that the Defendant's forty-one felony convictions in the present case would have been enough, standing alone, to find that he had an extensive criminal record. See, e.g., State v. Cummings, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992) (holding that relevant to partial consecutive service, a defendant with no prior criminal history had an extensive criminal history due to eight felony convictions in that case). In addition, the Defendant had two prior convictions for sexual offenses against different minor victims. The offenses in this case arose from the Defendant's committing years-long sexual abuse of his stepson, over whom he enjoyed a position of trust and almost unfettered access. Although detailed evidence was not presented of the abuse's long-term effect on J.M.'s mental health, he testified to being angry at A.M. and being angry in general at the time of trial. A.M. and Ms. Jackson testified that J.M. was not previously an angry or aggressive child, indicating at least some damage to his mental health. In addition, J.M.'s anal anatomy was significantly altered by the formation of scar tissue and skin tags. The court did not abuse its discretion by ordering consecutive service of the Defendant's sentences. However, as discussed above, because we have reversed fifteen of the Defendant's forty-one convictions, we remand the case to the trial court for resentencing.

## VIII.  Merger

Although raised by neither party, our review of the record indicates that the trial court improperly merged some of the convictions. We will examine the convictions to determine which offenses merge and which offenses remain separate.

Both the United States and Tennessee Constitutions prohibit multiple punishments for the same offense. State v. Thompson, 285 S.W3d 840, 846-47 (Tenn. 2009). A trial court's determination whether "multiple convictions violate double jeopardy is a mixed question of law and fact, which we review de novo without any presumption of correctness." State v. Watkins, 362 S.W.3d 530, 539 (Tenn. 2012) (citing Thompson, 285 S.W.3d at 846). Our supreme court in Watkins adopted the test found in Blockburger v. United States, 284 U.S. 299 (1932), for use in determining whether convictions for offenses under two different statutes constitute the same offense for double jeopardy purposes. 362 S.W.3d at 556.

The Blockburger test provides that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 284 U.S. at 304. The central analysis of the Blockburger test "requires an examination of the statutory elements [of the offenses] in the abstract,

without regard to the proof offered at trial in support of the offenses." Watkins 362 S.W.3d at 544. "If each offense includes an element that the other offense does not, the Blockburger test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." Id. (quoting Iannelli v. United States, 420 U.S. 770, 785 n.17 (1975)) (internal quotation marks omitted).

The first step in the Blockburger test is to determine the threshold question of "whether the convictions arise from the same act or transaction." Watkins, 362 S.W.3d at 556. "If the convictions do not arise from the same act or transaction, there cannot be a violation of the double jeopardy protection against multiple punishment." Id. In answering this question, we refer "to the charging instrument and the relevant statutory provisions" and "consider whether the charges arise from discrete acts or involve multiple victims." Id. Here, the offenses occurred against the same victim and related to discrete events occurring at specified locations, as reflected in the State's elections. Groups of offenses occurred in the same location, in close temporal proximity, and as part of a continuing criminal transaction. Therefore, we move to the next step of the Blockburger test.

The second step of the Blockburger test requires us "to examine the statutory elements of the offenses." Watkins, 362 S.W.3d at 557. The following presumptions apply to our examination of the statutory elements of the offenses:

> If the elements of the offenses are the same, or one offense is a lesser included of the other, then we will presume that multiple convictions are not intended by the General Assembly and that multiple convictions violate double jeopardy. However, if each offense includes an element that the other does not, the statutes do not define the "same offense" for double jeopardy purposes, and we will presume that the Legislature intended to permit multiple punishments.

Id. (internal footnote omitted).

As discussed above, rape is, in relevant part, defined as the "unlawful sexual penetration of a victim by the defendant or of the defendant by a victim . . . without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent." Tenn. Code Ann. § 39-13-503(a)(2). "Sexual penetration" means "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's [or] the defendant's . . . body, but emission of semen is not required." Id. § 39-13-501(7).

Incest is defined, in relevant part, as sexual penetration when the defendant knows the victim is his stepchild. Tenn. Code Ann. § 39-15-302(a)(2).

Aggravated statutory rape is defined as sexual penetration between a victim and the defendant where the victim is at least age thirteen but has not yet reached age eighteen and the defendant is at least ten years older than the victim. Tenn. Code Ann. § 39-13-506(c).

Statutory rape by an authority figure is, in relevant part, sexual penetration between a victim and the defendant where the victim is at least age thirteen but has not yet reached age eighteen, the defendant is at least four years older than the victim, and the defendant was in a "position of trust" that was used to accomplish the sexual penetration. Tenn. Code Ann. § 39-13-532(a)(1), (2), (3)(A).

Sexual battery by an authority figure is defined, in relevant part, as sexual contact between a victim and the defendant where the victim is at least age thirteen but has not yet reached age eighteen and the defendant was in a "position of trust" that was used to accomplish the sexual penetration. Tenn. Code Ann. § 39-13-527(a)(1), (3)(A). "Sexual contact" includes "the intentional touching of the victim's or the defendant's . . . intimate parts . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" Tenn. Code Ann. § 39-13-501(6).

Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a).

Aggravated sexual battery is defined, in relevant part, as the "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [when the] victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a).

We conclude that the trial court improperly merged aggravated statutory rape (Counts 2, 7, and 12), statutory rape by an authority figure (Counts 3, 8, and 13), sexual battery by an authority figure (Counts 4, 9, and 14), and incest (Counts 5, 10, and 15) into the rape convictions (Counts 1, 6, and 11). Each of these respective convictions require elements pertaining to the victim's and the defendant's ages and relationship (kinship or a position of trust) that rape does not; similarly, they do not require proof of non-consent.

We note, however, that sexual battery by an authority figure is a lesser-included offense of statutory rape by an authority figure. Two differences exist in the elements of these offenses—proof of sexual contact versus sexual penetration and proof of the defendant's being at least four years older than the victim. Relative to the degree of sexual contact, pursuant to part (b) of our supreme court's analysis in State v. Burns, 6

S.W.3d 453, 466-67 (Tenn. 1999), an offense is a lesser-included offense if the only distinguishing elements establish, in relevant part, "a different mental state indicating a lesser kind of culpability . . . [or] a less serious risk of harm to the same person[.]" Proof of sexual contact involves a less serious risk of harm than sexual penetration. See, e.g., State v. Howard, 504 S.W.3d 260, 274 (Tenn. 2016) (discussing in the context of rape of a child and aggravated sexual battery that sexual contact involved a less serious risk of harm and a lesser degree of culpability than sexual penetration). The only remaining distinguishing element between the offenses is proof of the defendant's age in statutory rape by an authority figure. Because each offense does not contain a distinct element from the other, they should have been merged to reflect three counts of statutory rape by an authority figure. Therefore, we remand for corrected judgments reflecting the merger of Counts 4, 9, and 14 into Counts 3, 8, and 13, respectively, and separate sentencing on Counts 2, 3, 5, 7, 8, 10, 12, 13, and 15.

Likewise, the trial court erred by merging the incest convictions in Counts 49, 52, 55, 58, 61, 70, 106, and 109 into the rape of a child convictions in Counts 48, 51, 54, 57, 60, 69, 105, and 108, respectively.[23] Incest requires proof of a familial relationship and does not require proof of the victim's age. However, because the State's elected dates were not proven in relation to Counts 49, 52, 55, and 61, as discussed above, these convictions have been reversed and dismissed. We therefore remand for sentencing on the remaining incest convictions in Counts 70, 106, and 109.

The Defendant's convictions as revised herein will reflect the following: three counts of rape (Counts 1, 6, and 11); three counts of aggravated statutory rape (Counts 2, 7, and 12); three counts of statutory rape by an authority figure (Counts 3, 8, and 13); six counts of incest (Counts 5, 10, 15, 70, 106, and 109); three counts of rape of a child (Counts 69, 105, 108); and two counts of violating the sex offender registry (Counts 144 and 145). None of these convictions should be merged. We remand the convictions for resentencing.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, we reverse and dismiss the convictions in Counts 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61 and 62. We remand the case to the trial court for resentencing, for the entry of judgments reflecting separate convictions in Counts 2, 3, 5, 7, 8, 10, 12, 13, 15, 70, 106, and 109,

---

[23] The trial court correctly merged Counts 50, 53, 56, 62, 71, 107, and 110 for aggravated sexual battery into rape of a child as a lesser-included offense. Because the State's elected dates were not proven in relation to Counts 50, 53, 56, and 62, though, these convictions have been reversed and dismissed. The judgments in Counts 71, 107, and 110 correctly reflect merger with Counts 69, 105, and 108 and need not be revised.

and for the entry of corrected judgments reflecting the merger of Counts 4, 9, and 14 into Counts 3, 8, and 13, respectively.  In all other respects, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE